709 A.2d 177

**Johnny WALKER**

v.

**STATE of Maryland.**

**No. 1612, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

May 5, 1998.

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before MURPHY, C.J., and DAVIS and HARRELL, JJ.

DAVIS, Judge.

Appellant Johnny Walker was tried and convicted by a jury in the Circuit Court for Baltimore City of child abuse and second degree sexual offense committed on two daughters of his former girl friend. He was thereafter sentenced to concurrent terms of fifteen years for sexual child abuse and twenty years for the second degree sexual offense. From these convictions, he appealed to this Court raising the following questions, which we restate for clarity:

I. Did the lower court deprive appellant of his constitutional right to a public trial by excluding all of appellant's family members from the courtroom during the testimony of the two alleged victims?

II. Did the lower court err by refusing appellant's request for a jury instruction that the State must prove that the crime against Salaunah occurred between 1992 and 1996 as alleged in the indictment?

III. Did the lower court err by not ruling on appellant's objection to the prosecutor's jury argument that appellant was an "animal"?

IV.   Did the lower court err by overruling appellant's objection to the prosecutor's rebuttal argument to the jury to "remember that the only evidence you will receive in this case has come from the State" and that the State's "evidence remains uncontroverted"?

Because we answer question I in the affirmative, we reverse the judgment of the lower court and we do not reach questions II and IV; however, we address question III for the guidance of the lower court on remand.

## FACTS

For more than ten years, appellant had a romantic relationship with the mother of the two victims. At the same time, according to Tuleeya, the eldest of the two daughters—who was seventeen years old at the time of trial—appellant began, when she was eight years old, touching and feeling her inappropriately and, when she was nine and ten years old, he demanded that she perform fellatio on him. Because of his inability to penetrate the young victim, appellant was unsuccessful in his attempts to engage in coitus with the victim. Appellant ultimately relented when the victim was fourteen years old, because she was then more physically able to resist his sexual advances.

Twelve year old Salaunah testified that appellant took her into the bathroom, ostensibly to brush her teeth, but instead covered her eyes with his hand and then inserted something that "sort of felt like when you put your hand in your mouth. It felt like skin." Thereafter, Salaunah heard appellant pulling up his pants and then the noise of his zipper being pulled up. This occurred before the witness began attending school.

The mother of the two victims, Zelma B., testified that, approximately two days after she ended her relationship with appellant, Tuleeya advised her that appellant had sexually abused her. Salaunah previously had related the incident to her in which appellant had told the younger daughter to close her eyes so that he could brush her teeth, but, when the

witness (Zelma B.) confronted appellant, he had denied that the incident occurred.

Prior to trial, the prosecutor asked that members of appellant's family be excluded from the courtroom during the testimony of the two victims because they had said things to the two victims and "they [the two victims] feel very frightened and very intimidated by that." The court indicated when the witnesses were called to testify, "I'll hear from [appellant's counsel] and I'll deal with it at that time." Additional facts will be supplied in conjunction with the discussion that follows.

### i

In granting the request to exclude appellant's family members from the courtroom, the following colloquy transpired:

[PROSECUTION]: Your Honor, at this time, the State would like to renew its motion to have the courtroom emptied of any of the [appellant's] relatives or—with respect to this case, inasmuch as the victims are child witnesses and they've had some problems in the past in terms of intimidation by the family of the [appellant]. So, I would just ask that this courtroom be cleared of them at the time Tuleeya and Salaunah ... testify with respect to this, this matter.

THE COURT: How old are the witnesses, [prosecutor]?

[PROSECUTION]: The oldest witness is 17 and the youngest is 12.

THE COURT: And are the witnesses related to the [appellant's] family?

[PROSECUTION]: Well, the [appellant] is the stepfather of the witnesses. The mother of the children was in a relationship with the [appellant] for 10 years. He lived in the home during that period of time.

THE COURT: And have the children expressed—the witnesses expressed any concern to you about testifying in the present (*sic*) of the [appellant's] family?

[PROSECUTION]: Yes, they have, Your Honor. They have, and that's why I'm making the request of the Court,

because they have expressed concerns in terms of having to testify in their presence.

THE COURT: [Appellant's Counsel], do you wish to be heard?

[APPELLANT'S COUNSEL]: Except that we would object. We believe that these witnesses are not of tender years. And if the State felt there was [sic] some problems, then made arrangements to have [sic] testify via the TV camera. But this is an open proceeding. My client's family has been very supportive throughout this whole situation. They are here, they've always been here. I don't believe that inside the courtroom they pose any threat. We don't believe that there ever has been a threat by the family with respect to these particular witnesses, and that's not their purpose for being here. If these witnesses made allegations, then now's the time to express them in front of—in court and in an open courtroom. We believe that this should be an open proceedings and that their ages, Your Honor, would make them competent witnesses and, as I stated earlier, that there's nothing that would prevent them from testifying in open court.

THE COURT: Okay. Well, certainly the [appellant] has a right to a public trial and the public has a right to attend the trial, and the [appellant's] family is part of the public. I do think, however, the Court is obliged to assure that witnesses are permitted to testify freely—

Are you having a problem, [prosecutor]?

[PROSECUTION]: —thank you, Your Honor.

THE COURT: —testify freely and without any fear of intimidation. And I understand that in a case such as this where families are essentially—wind up pitted against one another as a result of these allegations which are incredibly disruptive and destructive to a family that opinions can overflow on the witness and make the witness, whether the witness is a child or an adult, feel intimidated and feel threatened in some way, not only in

the courtroom itself but after the proceedings are over, as to what the consequences of their testimony may be perceived to be by the family of the [appellant].

Considering all of that and considering the young age of the witnesses, even though they are old enough and competent, and also considering the fact that the quality of the witness's testimony is—it is preferable, I think, under any circumstances to have live witness testimony before a jury to video testimony. And the benefit of permitting the [appellant's] family to be present is far outweighed by the benefit of the jury of having live—and the [appellant], for that matter—of having live witness testimony.

I'm going to grant the State's motion and request that members of the [appellant's] family be excused from the proceedings during the testimony of the child witnesses. Thank you.

[PROSECUTION]: Thank you, Your Honor.

Stating that he was deprived of his right to a public trial, appellant asserts that the court's decision to exclude his family, during the testimony of the alleged victims was prejudicial error. According to appellant, the trial court, by not finding that closure was "essential" and not attempting narrowly to tailor the exclusion, did not meet the requirements of *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). Appellant avers that the trial court, without considering any other evidence, accepted the State's proffer as true. In addition, appellant contends, the trial court's findings were not specific enough for us to determine, on appeal, whether its order was proper.

■■■ The Sixth Amendment to the U.S. Constitution guarantees an accused the "right to a speedy and public trial." *Cox v. State*, 3 Md.App. 136, 139, 238 A.2d 157 (1968). The privilege of the public to attend trials is not, however, unrestricted. *Ex Parte Sturm*, 152 Md. 114, 122, 136 A. 312 (1927). "In determining whether any part of the public should be excluded from the trial of a criminal case, some discretion

must be allowed the trial [c]ourt." *Dutton v. State*, 123 Md. 373, 387, 91 A. 417 (1914).

Articulating the purpose of the public trial requirement, the Court of Appeals, citing to *Cooley's Constitutional Limitations*, page 312, stated that it

> ... is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility, and to the importance of their functions; and the requirement is fairly met with if, without partiality or favoritism, a reasonable portion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether.

*Dutton*, 123 Md. at 388–89, 91 A. 417.

■ In *Waller*, the Supreme Court held that "the right to an open trial may give way in certain cases to other rights or interests." *Id.* 467 U.S. at 45, 104 S.Ct. at 2215. The Court has also opined that

> [t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press–Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984). In other words, the party seeking the exclusion "must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48, 104 S.Ct. at 2216.

The Supreme Court, in concluding that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in

some cases, a defendant's right to face his or her accusers in court," addressed the effect of permitting a child witness to testify on closed-circuit television and the effect this procedure had on the defendant's Sixth Amendment right to confront witnesses against him. *Maryland v. Craig*, 497 U.S. 836, 853, 110 S.Ct. 3157, 3167, 111 L.Ed.2d 666 (1990). The Court noted that the State's interest in "the protection of minor victims of sex crimes from further trauma and embarrassment is a compelling one," *id.* 497 U.S. at 852, 110 S.Ct. at 3167 (citations omitted), and that " '[m]any States have determined that a child victim may suffer trauma from exposure to the harsh atmosphere of the typical courtroom and have undertaken to shield the child through a variety of ameliorative measures.' " *Id.* 497 U.S. at 853, 110 S.Ct. at 3167 (quoting *Coy v. Iowa*, 487 U.S. 1012, 1022–23, 108 S.Ct. 2798, 2804, 101 L.Ed.2d 857 (1988)).

The Supreme Court, in discussing the use of closed-circuit television, however, held that the State must make an "adequate showing of necessity" for its use. *Craig*, 497 U.S. at 855, 110 S.Ct. at 3169. The Court held that the trial court must determine whether use of the procedure is necessary to protect the welfare of the child victim, and must find that the child victim "would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Craig*, 497 U.S. at 855–56, 110 S.Ct. at 3168–69. The Court concluded that, if the trial court determines the child victim is traumatized by the courtroom generally, rather than by the presence of the defendant, the denial of face-to-face confrontation would be unnecessary because "the child could be permitted to testify in less intimidating surroundings, albeit with the defendant present." *Id.* 497 U.S. at 856, 110 S.Ct. at 3169.

On remand from the Supreme Court, the Maryland Court of Appeals announced certain guidelines for the trial judge to follow in determining whether the use of closed-circuit television was warranted. The Court of Appeals held that the trial judge ordinarily should determine the question of the child's ability to testify in front of the defendant "by personally observing and interviewing the child, on the record, either in

or outside the courtroom." *Craig v. State*, 322 Md. 418, 433, 588 A.2d 328 (1991). The Court of Appeals held that the "prudent trial judge" should consider expert testimony when offered as an aid in determining whether to use closed-circuit television, but that such testimony is not essential to the court's determination. *Id.* at 426–28, 588 A.2d 328. MARYLAND CODE (1957, 1996 Repl.Vol., 1997 Supp.), Art. 27, § 774(c), prescribing procedures for the use of closed-circuit television, provides that the judge "may" observe and question the child either inside or outside the courtroom and hear testimony of a parent or a custodian of the child or any other person including a person who has dealt with the child in a therapeutic setting.

We are mindful that the instant case does not involve the testimony of a child abuse victim via closed-circuit television nor does it involve removal of all of the spectators from the courtroom. The public may only be excluded, however, "pursuant to a narrowly tailored order necessary to protect an overriding State interest." *Watters v. State*, 328 Md. 38, 45, 612 A.2d 1288 (1992). It may be, in the case *sub judice*, that the State could have established an overriding State interest sufficiently important to outweigh the defendant's right to face his accusers had there been efforts to adduce evidence beyond a vague proffer of intimidation by members of the defendant's family. As the Court of Appeals concluded in *Craig* and as § 774(c) of Art. 27 prescribes, Tuleeya and her sister, Salaunah, could have been observed or questioned either inside or outside of the courtroom regarding the alleged intimidation. Similarly, any other member of the family of the victims who were privy to the alleged intimidation could have been examined by the trial judge.

It is incumbent upon the trial judge to make more than a general finding that all children suffer trauma when testifying or, as in this case, not to encroach upon the defendant's right of confrontation by clearing the courtroom of all of the defendant's family members without conducting an examination to ascertain the accuracy or validity of the State's proffer.

We hold that, in the absence of such evidence, we cannot determine from this record whether the trial judge's order was narrowly tailored to the exigencies of the case at hand and, as a consequence thereof, the court abused its discretion.

ii

During closing argument, the prosecutor argued:

[PROSECUTION]: ... Think about it—indicates, indicates to you what [sic] these children were repeatedly sexually molested by that [appellant].

The evidence reveals to you that—that he's an animal.

[APPELLANT'S COUNSEL]: Objection, Your Honor.

[PROSECUTION]: That he's a pervert and that he sexually molested babies. I want you to concentrate on that evidence and I want you right now to—about the testimony of Tuleeya and Salaunah.... I want you to close your eyes right now and to reflect upon the testimony of Tuleeya and Salaunah. Juror Number 1, can you hear the silent screams of Tuleeya as she asks for help? She's only eight years old—

Juror Number 2, can you hear the silent screams of Tuleeya as she turns 10 years of age and the [appellant] forces his way into the bedroom and places his penis in her mouth? Juror Number 3, can you hear the silent screams of a baby that's only 10 years old when the person she calls Daddy places his penis in her vagina and it hurts, and she starts to bleed and she cries and no one comes in assistance?

Juror [sic] Number 4 and 5, can you see, can you see Tuleeya as the [appellant] ejaculates his sperm all over her face—her cries for help go unanswered? Juror Number 7, can you see the baby Tuleeya as she pushes her bureau against the door to protect herself? But there's no protection for her. The [appellant] gets in and he abuses her again, and he[r] cries for help go unanswered.

Juror [sic] Number 8 and 9, can you hear Tuleeya as her screams for help become more and more—because

she's learned that no one listens to her screams for help? Jurors Number 10 and 11, can you hear the cries of Salaunah as the [appellant] places his, his penis in her mouth on the pretense of brushing her teeth?

Juror Number 11, can you hear Salaunah as she tells her mother about—and her mother does absolutely nothing? Juror Number [sic] 11 and 12, can you hear—screams—

Appellant complains that the trial court, by never ruling on his objection and permitting the State to continue its argument, implicitly gave approval to the State's characterization of appellant as an "animal." Such approval, appellant contends, was prejudicial error. Appellant avers that the State's characterization was not an isolated incident, as it also referred to him as a "pervert." According to appellant, the State's comments amounted to "an appeal to passion that was calculated to unfairly prejudice [him]." As a result, he was deprived of his right to be tried based on facts, instead of emotions. Although we need not reach this issue because of our disposition of issue I, we address the issue, nonetheless, because we are troubled by the state of the record before us.

The leading case in Maryland on improper argument of counsel is *Wilhelm v. State,* 272 Md. 404, 326 A.2d 707 (1974). There, the prosecutor, in referring to the murderer of a Baltimore County police officer, argued to the jury, "the State feels *this is the Jury's chance* as individuals and collectively as citizens of Baltimore County—*we hear the hue and cry of police protection*—we feel *this is your occasion to do something about it." Id.* at 407, 326 A.2d 707. The Court of Appeals, citing *Commonwealth v. Feiling,* 214 Pa.Super. 207, 252 A.2d 200 (1969), observed:

Although appeals to prejudice and passion are not to be approved, we have held that a District Attorney in his arguments, within proper limits, may argue for law and order and remind the jury of the danger to the community posed by persons prone to resort to violence. We hold that those limits were not exceeded in the present case although

the District Attorney's remarks were directed to the individual jurors as members of the community. Generally *it is for the trial judge to determine whether such remarks are so prejudicial as to require a new trial on that ground alone*, or whether their effect was sufficiently attenuated by the rest of the argument as to have no effect on the verdict. *Wilhelm*, 272 Md. at 433, 326 A.2d 707 (emphasis added; citations omitted).

In affirming Wilhelm's conviction, the Court of Appeals noted that counsel for Wilhelm requested no cautionary instruction to the jury nor was any given. Counsel, however, had made a motion for a mistrial that was denied.

In addition to whether a cautionary instruction to disregard unwarranted remarks and conduct of a prosecuting attorney had been given, citing *Contee v. State*, 223 Md. 575, 165 A.2d 889 (1960), 229 Md. 486, 184 A.2d 823 (1962), *cert. denied*, 374 U.S. 841, 83 S.Ct. 1895, 10 L.Ed.2d 1062 (1963), the *Wilhelm* Court, in its exhaustive discussion of improper comments, held that other considerations as to whether improper remarks warranted reversal are (1) whether the assailed argument constituted a material factor in the conviction (*Wilhelm*, 272 Md. at 431, 326 A.2d 707); (2) whether the comments related to a matter outside the record (*id.* at 435, 326 A.2d 707); (3) whether the evidence concerning appellant's guilt was not "close," but was rather "overwhelming," (*id.* at 437, 326 A.2d 707); (4) whether there was evidence that the proceeding was "dominated by prejudice and passion," (*id.* at 445, 326 A.2d 707), and ultimately, what exceeds the limits of permissible comment depends upon the facts in each case (*id.* at 415, 326 A.2d 707).

The State, in oral argument before us, makes the point that argument by counsel should be robust and, indeed, the Court of Appeals in *Wilhelm,* citing *Dunlop v. United States*, 165 U.S. 486, 17 S.Ct. 375, 41 L.Ed. 799 (1897), observed, "If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the

most experienced counsel are occasionally carried away by this temptation." *Wilhelm,* 272 Md. at 414, 326 A.2d 707.

More directly on point, in *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the Supreme Court considered the following closing argument by the prosecutor:

As far as I am concerned, and as [defense counsel] said as he identified this man *this person, as an animal, this animal was on the public* for one reason.

He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash. I wish [Mr. Turman] had had a shotgun in his hand when he walked in the back door and blown his [petitioner's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun. I wish someone had walked in the back door and blown his head off at that point. He fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself. I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time.

The above argument had been made in response to the petitioner's closing argument to the jury:

The first witness you saw was Mrs. Turman, who ... had her husband slaughtered before her eyes, by what would have to be a vicious animal. And this murderer ran after him, aimed again, and this poor kid with half his brains blown away.... *It's the work of an animal,* there's no doubt about it.

So they come on up here and ask Citrus County people to kill the man.... The question is, do they have enough evidence to kill that man, enough evidence? And I honestly do not think they do.

Petitioner had been on a weekend furlough from a prison sentence when he committed the crime for which he was subjected to the death penalty. In ultimately holding that, "Darden's trial was not perfect—few are—but neither was it fundamentally unfair," *id.* 477 U.S. at 183, 106 S.Ct. at 2472, the Supreme Court noted that the prosecutor's argument did

not manipulate or misstate the evidence nor implicate other specific rights, such as the right to counsel or the right to remain silent. The Court also observed that the objectionable comment was invited by or was responsive to the opening statement of the defense which the Court held, "is used not to excuse improper comments, but to determine their effect on the trial as a whole." *Id.* 477 U.S. at 182, 106 S.Ct. at 2472. Moreover, under a Florida Rule of Procedure, petitioner was allowed to give a rebuttal summation to the prosecutor's closing argument because, under the rule, he had been the sole witness in his defense. Accordingly, the Court held, petitioner's counsel was able to use this opportunity for rebuttal "very effectively, turning much of the prosecutor's closing argument against them by placing many of the prosecutor's comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner."

Notably, the Court held:

> The prosecutors then made their closing argument. *That argument deserves the condemnation it has received from every court to review it,* although no court has held that the argument rendered the trial unfair. Several comments attempted to place some of the blame for the crime on the Division of Corrections, because [petitioner] was on weekend furlough from a prison sentence when the crime occurred. Some comments implied that the death penalty would be the only guarantee against a future similar act. Others incorporated the defense's use of the word "animal."

*Darden,* 477 U.S. at 180–81, 106 S.Ct. at 2471.

In *Keene Corp., Inc. v. Hall,* 96 Md.App. 644, 666, 626 A.2d 997 (1993), appellee's counsel declared:

> Judgment day is a day for you to tell these defendants that after you've received the evidence you see them for what they really are, and that is a bunch of corporate liars, a bunch of corporate mutilators, a bunch of corporate murderers. You see—

[APPELLEE'S COUNSEL]: I object.... Corporate mur-
derers? ... I—I move for a mistrial.

Counsel for appellee, after the court's denial of the motion
for mistrial, advised the jury that, like opposing counsel who
had stated that he formerly was a State's Attorney, appellee's
counsel "used to prosecute cases in this courthouse and these
defendants, these corporations—they are no different. They
are no better than a common criminal walking on the streets."
After a further objection, the trial judge reminded both attor-
neys that they were not trying a criminal case and "I think it's
high time the jurors got to determining the issues in the case."

We recognize that *Keene Corp.,* a civil case, does not
implicate the constitutional imperatives of a criminal trial;
however, we believe the holding is pertinent to the ultimate
goal in any trial, i.e., the search for truth. Judge Diana Motz,
speaking for this Court, denounced counsel's argument:

On appeal, the [appellees] do not assert that the remarks
were proper. They clearly were not. As Chief Judge
Wilner recently noted in another civil case in which counsel
used improper argument, it is "wholly inappropriate to
accuse [the defendant] of 'theft,' or 'stealing,' or 'robbery.'
There is no need for snide remarks, pejorative, and un-
founded hyperbole or exaggeration, and they should not be
permitted. The search for truth, which is supposedly the
principal function of a trial, is assisted much more by light
than by heat." We need not here determine if these
improper remarks caused such prejudice as to require a
new trial because a new trial is in any event required. We
trust, however, that sort of argument will never again be
made by the [appellees'] counsel.

*Keene Corp.,* 96 Md.App. at 666, 626 A.2d 997 (citations
omitted).

A review of the record in the case *sub judice* reveals that
when the objection was made to the Assistant State's Attor-
ney's characterization of appellant as "an animal," there was
no ruling on the objection and the prosecutor—with what
appeared to the jury to be the Court's tacit approbation—was

permitted to proceed with her closing argument. Immediately thereafter, the prosecutor referred to appellant as "a pervert" who "sexually molested babies." The prosecutor then made an entreaty to each of the jurors *seriatum* asking that each juror envision the screams of the two young victims as they were sexually assaulted by appellant, which screams went unheeded.

On this appeal, appellant does not complain of the graphic and impassioned references to the silent screams of the victims; we view them, were they standing alone, as being within the parameters of the "ardor of advocacy." Appellant did not object at trial to being referred to as a "pervert," (just as he had failed to object to the references to silent screams), although on appeal he lumps that characterization along with the reference to him as "an animal" in contending that the comments amounted to an appeal to passion. Although WEBSTER'S THIRD NEW INTERNATIONAL UNABRIDGED DICTIONARY (1986) defines a "pervert" as "one who is given to turning away from that which is good or true or morally right," the appellation has come to be synonymous with that which is utterly debased and odious. As in the case of the reference to the silent screams, except in a very close case, we would not be inclined to find the reference to appellant as "a pervert," standing alone, reversible error even though the preferable course would have been to refer to appellant's conduct as "perverse."

Indeed, the nature of the evidence presented certainly gives rise to the conclusion that the actions of appellant—assuming them to be true as we must—were perverse, to say the least. When viewed, however, in the context of the totality of the prosecutor's closing argument, given such odious offenses, it is ironic that resort to excessive appeals to passion are needed to secure a conviction when the nature of the charges and the evidence adduced, without embellishment, is inherently inflammatory, albeit properly so. The right to a fair trial and the search for the truth, however, should not be hampered or obfuscated by extreme appeals to passion calculated to inflame the jury.

■ When the reference to the silent screams and "pervert" are considered in conjunction with the characterization of appellant as "an animal," we believe the prosecutor, in her zeal, exceeded the bounds of proper comment. Not only is it inappropriate to refer to a defendant in a criminal case as "an animal," it may be argued that such a strategy, in some instances, could be counterproductive should the jury view the State as engaging in a personal contest with the defendant. It is incumbent upon the People's representative to maintain an air of dignity and stay above the fray.

In *Viereck v. United States*, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), the Supreme Court decided a case involving violation of a statute requiring certain agents of foreign principals to register with the Secretary of State. In opining that "the purpose and effect of [the prosecutor's closing remarks to the jury] could only have been to arouse passion and prejudice," the Court admonished:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* 318 U.S. at 248, 63 S.Ct. at 566–67 (citation omitted).

In the present case, the trial judge failed to rule on the objection lodged by appellant's counsel, but rather permitted counsel to raise the decibel level from "animal" to "pervert." Then in an impassioned recapitulation of the evidence, the prosecutor presented graphic images of what admittedly is

repugnant conduct. The proper course would have been for the trial judge, under the circumstances, to rule on the objection to the appellation, thereby affording counsel an opportunity to request a curative instruction to the jury.

In accord with the observation by the Supreme Court in *Darden* that the argument there "deserves the condemnation it has received from every court to review it," we also find such a reference beneath the dignity of the prosecutor's office and believe that the better practice would be to characterize a defendant's actions, rather than to engage in name calling.

Having concluded that the characterization of appellant as "an animal" was improper, our task, then, normally would be to decide whether the remark warrants reversal. That analysis would have been pursuant to the procedure we set out in *White v. State*, 66 Md.App. 100, 121, 502 A.2d 1084 (1986), in which we explained:

> The *Wilhelm* Court continued to state that the applicable test for prejudice is whether the reviewing Court can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.
>
> The Court then set out three factors to be considered in determining whether a prosecutor's remarks prejudiced the defendant: first, the closeness of the case; second, the centrality of the issue affected by the error; and third, the steps taken by the trial judge to mitigate the effects of the remarks.

(Citations omitted.)

Because a new trial is in any event required, we need not here determine if these improper remarks caused such prejudice as to require a new trial. We trust, however, that counsel in the future will refer to the *actions* of a defendant rather than resort to epithets, thereby avoiding the unnecessary risk of overturning any conviction obtained.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED FOR A NEW TRIAL CONSISTENT WITH THIS OPINION.**

COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.