741 A.2d 519

Jamal HOLT and John Holt

v.

STATE of Maryland.

No. 5220, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Dec. 2, 1999.

Michael R. Braudes, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant, Jamal Holt.

Kreg Paul Greer, Assigned Public Defender, on the brief), Bel Air, for appellant, John Holt.

Thomas K. Clancy, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Patricia Jessamy, State's Attorney for Baltimore City, on the brief), Baltimore, for appellee.

Submitted before HOLLANDER, THIEME and JAMES S. GETTY (Ret'd, Specially Assigned), JJ.

JAMES S. GETTY, Judge (Retired, Specially Assigned).

At the conclusion of a jury trial in the Circuit Court for Baltimore City, Jamal Holt and his brother, John Holt, were convicted of conspiracy to distribute heroin and conspiracy to distribute cocaine. Jamal was sentenced to 20 years with all except twelve years suspended for conspiracy to distribute cocaine, to be followed by five years supervised probation. He also received a concurrent five-year sentence for conspiracy to distribute heroin. John Holt was sentenced to 20 years imprisonment, the first ten years without parole, on the cocaine conspiracy charge, and to a concurrent ten-year sentence on the heroin conspiracy charge.[1]

In this appeal, Jamal and John raise the following issues, which we have rephrased as to form:

1. Were appellants denied the Sixth Amendment right to a public trial?

---

[1]. Appellants were acquitted of conspiracy to murder and acquitted of murder of Louis Martinez and Louis Rodriguez.

2. Were appellants entitled to a severance of the murder charges?

3. Was the evidence sufficient to convict appellants of conspiracy to distribute heroin?

4. Did the court err in admitting against Jamal incriminating statements, made by him during his cooperation with the police, relating to an agreement between the United States and Raymond Stern?

### *Background*

On October 4, 1997, at approximately 7:40 p.m., Louis Martinez and Louis Rodriguez, two drug dealers from New York, were shot to death in a yellow Cadillac on a parking lot adjoining an apartment complex at 1408 Odessa Thomas Court in Baltimore.

Two female students at the University of Maryland Eastern Shore in Princess Anne testified that on the day of the murders Jamal took them from their homes in Baltimore back to Princess Anne. They began the trip at 5:00 p.m.; the time required for the trip was said to be two and one-half hours. If that information were true, Jamal could not have been at the scene of the murders at 7:30 p.m.

Jamal first came to the attention of the police on the drug charges as a result of his alleged effort to assist his cousin, Raymond Stern, who was awaiting sentencing in a federal prison for cocaine trafficking. Stern offered to persuade Jamal to "set up" a major drug dealer who would be apprehended while selling drugs to Jamal. Upon the success of this venture, Stern would receive a reduced sentence.

In furtherance of this scheme, Jamal was given the pager number of Detective William Nickels, a Baltimore City narcotics officer assigned to a federal task force. Nickels testified that Jamal called him the day before the murders and said that he was a purchaser of cocaine from a supplier named "Jimmy" (an alias for Louis Martinez), who came from New York to Baltimore with kilogram quantities of cocaine.

Nickels stated that Jamal called again on the day of the murders and said he was meeting with "Jimmy" at 2:00 p.m. at the Northwood Shopping Center and "Jimmy" would have kilos of cocaine. Nickels set up a surveillance, but no one appeared. Jamal did not call thereafter.

Carlos Zapata, a member of the Louis Martinez drug organization, testified that he sold cocaine to Jamal and to John from June 1997 until Martinez was shot on October 4. These sales, five or six in number, usually took place at Odessa Thomas Court and, according to Zapata, he was accompanied by Martinez and Rodriguez. One sale of heroin, allegedly requested by John, was not completed because the delivery agent was arrested while in possession of the heroin.[2]

Zapata, Gilberto Reyes, and Jesus Alamanza Delarosa were all members of the drug organization, and all three testified to selling thousands of dollars worth of cocaine to Jamal. All three were impeached due to their use of aliases and the fact that they were not being prosecuted. Zapata owned the car in which the victims were shot, and his fingerprints were lifted from the exterior of the Cadillac.

William Gee lived at the Odessa Court Complex with Lovey Turraine, a cousin of the appellants. He placed both appellants at the residence several times on the day of the murders, but not in the 7:30 p.m. time range. Gee's brother, Clifton, was also at the residence. He testified that while he was out on an errand he heard the shots. He said both Jamal and John were at the apartment shortly after the shots were fired. According to Clifton Gee, Jamal was carrying a shoe bag, and John had a handgun wrapped in a gray shirt. Clifton's testimony was also impeached on the basis of a record for burglary and alcohol abuse.[3]

---

**2.** According to Zapata, they usually dealt in Cocaine because heroin degrades rapidly. The heroin, however, was to be furnished to John, who was a "good customer."

**3.** Obviously, Clifton Gee's testimony placing both appellants at the scene of the murders contradicts the alibi testimony of the female

For the defense, a resident of the apartment complex, Antoinette Little, testified that she saw the Cadillac with two occupants enter the parking lot as she was leaving in her car. She returned shortly thereafter and saw four persons in the car. She left a second time and looked at the man seated behind the driver. According to Little, that man was neither Jamal nor John Holt. She observed this man run off after the shots were fired. Initially, Little withheld most of this information from the police who interviewed her. Other facts will be supplied as they relate to the issues.

### *Discussion*

### I.

On the first issue, denial of a public trial, the record shows that four individuals were present in the courtroom throughout the trial. Two men and a young woman were not identified; the fourth person, known as "Bill," was a frequent spectator at criminal trials.

Prior to Clifton Gee's testimony, the State proffered that Gee was in protective custody. The State requested that members of the public be excluded during Gee's testimony because he was afraid of appellants, who had "people on the street." The State added that Lovey Turraine, who was at the apartment the day of the murders, could not be located for trial. Sometime after the murders, two men allegedly came to the Gee apartment and threatened her. Clifton Gee, the State claimed, was present and heard the threats. The discussion was as follows:

MS. HANKIN: Your Honor, I'm going to ask you if you would please to clear the courtroom of spectators this witness is in protective custody. He is afraid because John and Jamal Holt have people out on the street that he is being viewed and carefully, with an eye of what he looks like and to what is being said. I am afraid that if he sits on that

---

students who alleged that Jamal was driving them to Princess Anne at the critical hour.

stand that he will not testify truthfully, he will be afraid because there are people in the audience who belong to the family and he would be afraid to testify. They were not here yesterday. They haven't been here. I'm asking only for one witness.

MR. RAVENELL: First of all Your Honor that's not true, the people that were in this courtroom were here.

THE COURT: Well, they've already seen him.

MR. RAVENELL: Right. Exactly. I know what this is about.

MS. HANKIN: They don't know what he's going to testify to.

MR. RAVENELL: So what.

THE COURT: Well, I don't have any -

MR. RAVENELL: Your Honor, this is an open public forum.

MS. HANKIN: Your Honor, there is a very quiet -

MR. RAVENELL: There is no basis that the State has put forward to do that and I do not want this jury coming in here thinking that somehow this courtroom emptied -

THE COURT: Hold it. I don't want them coming and then seeing it empty. Hold them please.

MS. HANKIN: Hold up for a minute please. I thought there was a Clerk.

THE COURT: The Clerk is out here. I only have one Clerk.

MS. HANKIN: Your Honor, it's a very fine line. [I]t's a fine intimidation point. Life on the street is very difficult. It is hard for these people to come in and testify. We've tried to tell you repeatedly. We have considerable problems. We have people incarcerated. We have people in protective custody. I'm begging for -

THE COURT: I'm not going to do this with every witness.

MR. CARDIN: Your Honor.

MS. HANKIN: I'm not asking for any other witness. You know we don't have Lovey. You can see why we don't have Lovey. Our cards are out on the damn table, excuse me, I'm asking you for this witness to have them not to be present during the testimony.

MR. CARDIN: Your Honor, this witness is in protective custody we know that, that's number one. I don't know how long he's been in protective custody but he's been in protective custody. That's number one.

Number two part of the test of any witnesses [sic] credibility is to have to testify under oath and before the public. That's always been part of our system of justice.

MS. HANKIN: That's not true.

THE COURT: He didn't interrupt you.

MR. CARDIN: That is why a Defendant is insured and assured of a public trial and these Defendants are entitled to that and for the State to say that these people have not been here before is not true. And many things that the State has said to this Court have not been true.

MS. HANKIN: Mr. Cardin, really.

MR. CARDIN: And number two. And number two. Nobody had any idea that Mr. Clifton Gee was going to be testifying this afternoon. You know that as well as we do because we were surprised when we came in we expected Mr. Stern to be testifying.

MR. RAVENELL: So how is it that they would come here with intent to threatening Mr. Gee when no one knew?

MS. MYERS: Mr. Gee—

THE COURT: Excuse me, I've heard. I've heard it all. You finished?

MR. RAVENELL: Yes, Your Honor.

THE COURT: We live in trying times, difficult times. I make no implications but I'm going to air [sic] and I'm going to air [sic] on the side of caution. I'm going to grant the motion. Mr. Sheriff?

THE SHERIFF: Yes, sir.

THE COURT: Ask those people who are here to leave the courtroom unless they are—

THE SHERIFF: A witness. Unless they are a witness?

THE COURT: Yes. I don't know if there is an objection from the Defense.

MR. RAVENELL: There is an objection.

MR. CARDIN: Absolutely.

MR. RAVENELL: Absolutely. I'd like to make the record clear.

THE COURT: Fine. Okay. I've made my ruling.

MR. RAVENELL: I'd like to make the record clear, Your Honor.

THE COURT: Your record is clear.

MR. RAVENELL: No, no this record. Which is there are two individuals, one male and one female and a gentlem[a]n by the ballplayer Bill who have been in this courtroom.

THE COURT: Let Bill stay.

MR. CARDIN: No, no, no.

MR. RAVENELL: No, no, no.

THE COURT: Okay. Hold it, Mr. Cardin. I'm the Judge, you're Counsel. I make the rulings, you don't make the rulings.

MR. RAVENELL: Fine Your Honor, if you want to let Bill stay. He can stay.

THE COURT: He can—

MR. RAVENELL: Let me make my position is this the Court has selectively, taken over the courtroom, leaving law enforcement officers in the courtroom and now—

THE COURT: Make your record.

MR. RAVENELL: I am. There are four individuals. All four of those persons who were just escorted out of the courtroom have been here all during this trial. The two young men who were asked to leave and the person Bill and we all know him around the courthouse and the young female who has been in this courtroom have been here all

trial long. And for the jury to now come out and see that they are, at least two jurors walked out here a moment when the Court asked them not to come out. At least two jurors saw people in here I suppose.

THE COURT: You don't know what anybody saw.

MR. RAVENELL: You didn't let me finish, I said I suppose. You stopped me before I finished. I suppose. There were two jurors that actually exited. They I would suppose saw the same people who have been here all along and now all of the sudden they come out again and now the courtroom is cleared of those four people. I suggest that the Defendants are not getting a fair trial when they are not getting this public trial. I don't think it's going to matter any way what-so-ever. But I do think that it's important that the perception not be that there is something going on with this witness. That's what, I want to make that record and I am objecting to the Court clearing the courtroom.

THE COURT: Okay. Thank you.

Several recent appellate decisions have addressed the issue of a defendant's constitutional right to a public jury trial. In *Walker v. State,* 125 Md.App. 48, 723 A.2d 922 (1999), a partial closure edict by the trial court was vacated. In that case, during a suppression hearing, a State's witness assaulted the defendant, who was seated at the trial table. Defendant's mother, sister, and girlfriend, who were seated behind a rail, began screaming and moving toward the rail. Other court personnel, meanwhile, were busy separating the witness and the defendant. The jury was not present, although several jurors heard loud voices and movement coming from the courtroom.

The trial judge informed defense counsel that she made eye contact with the three women and repeatedly told them to "get out" but they did not comply. Whether the women defied the order to leave or they did not know the remarks were directed to them was never established, because the trial court barred all three from the remainder of the motions hearing and from the trial.

The entire fracas was recorded on videotape which this Court reviewed on appeal. The video established that only four members of the public were present in the courtroom. The visitors were the three women and an unidentified male. The closure, therefore, was not absolute; any member of the public other than appellant's three alleged family members could have attended.

This Court held that the trial court did not consider any reasonable alternatives to closing the proceedings. Additionally, the Court (Hollander, J.) decided that the breadth of the order far exceeded what was necessary to maintain proper decorum for the remainder of the trial. The fact that one individual was allowed to remain in the courtroom does not compensate for the exclusion of alleged family members who were the only other observers. A more narrowly crafted order could have been composed that would have met the trial court's legitimate concerns for maintaining an orderly proceeding. Unfortunately, nothing except removal was considered.

An earlier Maryland case, also titled *Walker v. State*, 121 Md.App. 364, 709 A.2d 177, *cert. denied*, 351 Md. 5, 715 A.2d 964 (1998), is likewise instructive. In that case, the accused was convicted of child abuse committed on two daughters of a former girlfriend. The sexual abuse began when the older child was eight years old. The younger sister was molested before she was of school age. At the time of trial, the victims were seventeen and twelve years old.

At trial, the State requested that all of appellant's family members be excluded from the courtroom during the testimony of the victims. The reason given for the request was "the victims are child witnesses and they've had some problems in the past in terms of intimidation by the family."

The trial court recognized that having the children testify by video camera was an option, but the court stated that live testimony before a jury was preferable to video testimony. In order that the children be permitted to testify freely without feeling threatened, the court concluded that "the benefit of

having appellant's family present is far outweighed by the benefit of the jury having live testimony." The family members were then excluded from the courtroom.

This Court (Davis, J.) reversed, stating:

It may be that the State could have established an overriding State interest sufficiently important to outweigh the defendant's right to face his accusers had there been efforts to adduce evidence beyond a vague proffer of intimidation by members of the defendant's family.

Absent such supporting evidence, the Court concluded, it is unclear whether the trial judge's order was narrowly tailored to the exigencies of the case. Finally, this Court made clear that a trial judge may not encroach upon a defendant's right of confrontation by clearing the courtroom of a defendant's family members "without conducting an examination to ascertain the accuracy or validity of the State's proffer."

The most recent case discussing a Sixth Amendment right to a public trial is *Carter v. State*, 356 Md. 207, 738 A.2d 871 (1999), authored for the Court by Chief Judge Robert M. Bell. In *Carter*, the State requested that the courtroom be cleared of all spectators during the testimony of a fourteen-year-old victim of sexual abuse committed by her stepfather, which included charges of rape. The trial court agreed, citing the "child's privacy and tender age" in recounting sexual abuse from age three.

Unlike the previous cases cited, *Carter* was a court trial, not a jury trial. The Court of Appeals reversed and remanded for a new trial. The Court of Appeals acknowledged that a public trial is for the benefit of the accused, *In re Oliver*, 333 U.S. 257, 268–71, 68 S.Ct. 499, 92 L.Ed. 682 (1948), and that the right to a public trial is not absolute, *Baltimore Sun Co. v. Colbert*, 323 Md. 290, 300, 593 A.2d 224 (1991). The Court held that where the right asserted in support of closure involves a defendant's Sixth Amendment right to a fair trial, a hearing may be closed only if specific findings are made on the record. In *Carter*, the trial court did not make any inquiry of the child, her parents, or anyone else to determine what effect

testifying in open court would have on the child. The court acted on nothing more than the proffer by the State.

The earlier *Walker* case, 125 Md.App. 48, 723 A.2d 922, was a partial closure in that three of the four persons present were removed from the courtroom, which is the identical number removed in the case *sub judice*. The removal in *Walker* was more onerous than the case before us, however, because the removal was for the duration of the trial rather than being limited to a single witness. The principal reason for the reversal, however, was the failure to address reasonable alternatives to closure.

Both the 1999 *Walker* case, at 121 Md.App. 364, 709 A.2d 177, and *Carter* involved clearing the courtroom during the testimony of young victims of sexual abuse. Unfortunately, in neither case did the trial court follow the dictates of *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), stating:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is *narrowly tailored* to serve that interest.

(Emphasis added.)

The case *sub judice* suffers from the same omission as the other cases cited. The trial court acted upon the suggestion by the State that one witness had been threatened by the defendants and could not be located for trial. The State also advised the court:

> I am afraid that if he sits on that stand that he will not testify truthfully, he will be afraid because there are people in the audience who belong to the family and he would be afraid to testify.

We have no doubt of the sincerity and concern by the State in protecting witnesses. As the proponent of the closure motion, however, it was incumbent on the State to produce evidentiary support that will provide the basis for the court to construct a narrowly tailored order to warrant closure.

■ Unfortunately, the State did not have the adult witness testify to the alleged intimidation or fear that he held. Neither were any of the three individuals questioned as to why they were present or what, if any, relationship they had with the accused. Under the case law interpreting the Sixth Amendment right to a public trial, a courtroom cannot be cleared based upon a proffer by the State. Reluctantly, but correctly, we reverse.

## II.

■ Appellants' second issue alleges error in denying a severance of the drug offenses from the murder charges. This issue is not properly before us because the opinion of the court on the severance motions is not included in the record. We cannot review that which we have not seen. The responsibility for providing a complete record rests upon appellants. *Whack v. State,* 94 Md.App. 107, 126–27, 615 A.2d 1226, *cert. denied,* 330 Md. 155, 622 A.2d 1196 (1993).

■ On the merits, furthermore, the murders arose from a drug distribution conspiracy. The record establishes that the brothers were acting in concert on the day of the murders. The drug distribution conspiracy lasted two years and the murders occurred during that period. Thus, the murders were overt acts in furtherance of the conspiracy to distribute drugs. Accordingly, the acts were evidence of the crime charged, which was conspiracy, not evidence of other crimes as alleged by appellants. *See Cook v. State,* 84 Md.App. 122, 131, 578 A.2d 283 (1990), *cert. denied,* 321 Md. 502, 583 A.2d 276 (1991).

■ We do not agree that John Holt was entitled to a severance. Both men were charged with identical crimes based upon the same substantive acts. Both were placed in the vicinity of the murders shortly before the shots were fired. John Holt was alleged to have been in possession of a handgun. Under Rule 4–253(a), a trial court may conduct a joint trial of two defendants "if they are alleged to have participat-

ed in the same[ . . . ] series of acts or transactions constituting an offense[. . . . ]'"

The trial court may require separate trials if either or both defendants will be prejudiced by joinder. The decision to join or sever charges is a matter within the trial court's discretion. *See Frazier v. State,* 318 Md. 597, 607, 569 A.2d 684 (1990). There is no presumption of prejudice to a defendant by joinder where, as here, the crimes arise out of an indivisible series of events or a common scheme. *Frazier, supra,* at 609–11, 569 A.2d 684. The burden of showing prejudice where defendants act in concert, therefore, is on the party alleging the same. The court herein did not abuse its discretion in denying a severance of the charges of murder and drug related offenses.

### III.

Appellants' third assignment of error alleges that their convictions for conspiracy to distribute cocaine and heroin merge. We agree.

The trial court imposed on Jamal Holt a sentence of 20 years with all except 12 years suspended, for conspiracy to distribute cocaine and an additional 5–year concurrent sentence for conspiracy to distribute heroin. John Holt was sentenced to 20 years with the first 10 years without parole on the cocaine charge and to a concurrent 10–year sentence on the heroin charge. There was but one conspiracy, irrespective of the number of criminal acts committed in the course thereof. *See Jordan v. State,* 323 Md. 151, 161, 591 A.2d 875 (1991). The convictions for conspiracy to distribute heroin are vacated. *See Henry v. State,* 324 Md. 204, 240, 596 A.2d 1024 (1991), *cert. denied,* 503 U.S. 972, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992) (holding that the substantive crime with the most severe penalty survives).

A second part of issue three raises the question of the sufficiency of the evidence to establish a conspiracy to distribute heroin. The issue is totally devoid of merit. The State

produced overwhelming evidence of a drug ring operating between New York drug suppliers and Baltimore drug distributors in which both appellants were fully involved. The New York contingent dealt primarily in cocaine. On one occasion, however, John Holt requested a shipment of heroin which the suppliers agreed to furnish "because he was a good customer." That heroin was never delivered, however, because the driver being arrested before arriving at the delivery site. Several members of the drug organization testified about the frequent drug deliveries to both appellants. The evidence was clearly sufficient for the trier of fact to have found an agreement between the appellants to distribute cocaine and heroin.

### IV.

Appellants' final issue asserts that Jamal Holt's admissions of drug dealing were inadmissible because they were made while he was participating with the State in a "sting" operation. The alleged purpose of the operation was to set up two out-of-state drug dealers who would be arrested in Baltimore while in possession of cocaine. Jamal agreed to participate in the scheme to help obtain a lesser sentence for his cousin, Raymond Stern, who was awaiting sentencing on federal narcotics charges.

Although appellants recite several theories in support of their argument, none are cause for reversal. John Holt has not preserved any of the arguments for judicial review. In fact, John's counsel was not even present at the hearing on Jamal's motion. When one co-defendant objects, but the other does not, the latter has not preserved the issue for appellate review. *See Sowell v. State,* 122 Md.App. 222, 228, 712 A.2d 96 (1998), *aff'd,* 353 Md. 713, 728 A.2d 712 (1999); *Osburn v. State,* 301 Md. 250, 253, 482 A.2d 905 (1984). Additionally, Fifth Amendment claims against self-incrimination asserted by Jamal are personal; that defense was not available to John Holt. *Couch v. United States,* 409 U.S. 322, 327, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

■ Significantly, the trial court's written opinion on the motion was not included in the record on appeal. We cannot undertake meaningful review of the court's ruling absent a complete record. *Whack, supra.*

■ At the motions hearing, Jamal argued that the introduction of his statements to the police would be a violation of his Fifth Amendment rights, and would otherwise be against public policy. The factual context in which the statements were made was as follows:

Stern, who had been prosecuted by the federal authorities, entered into an agreement with the United States Attorney's Office in an attempt to obtain consideration in his sentencing. Stern and his counsel met with DEA Agent Nickels and supplied information about Jamal's drug dealing. Stern advised Agent Nickels that Jamal would cooperate in setting up his supplier, "Jimmy," for an arrest.

Jamal then contacted the federal authorities and said that he was going to set up a meeting with the supplier at Northwood Shopping Center. No such meeting was ever set up and Jamal had no further contact with the police.

It seems patently clear that no one discussed or promised Jamal anything in exchange for his professed interest in helping his cousin Stern. To hold otherwise would encourage defendants to feign cooperation with the police and thereby insulate their statements from use by the State in subsequent trials. Nothing in the record suggests that Jamal was interrogated in order to obtain a confession; there was nothing coercive about the telephone conversation between Jamal and Agent Nickels. The police, furthermore, were well aware of Jamal's drug involvement as a result of the murder investigation.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**