[656 NYS2d 22]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HOK MING CHAN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MING LI, Appellant.

First Department, April 10, 1997

166

## APPEARANCES OF COUNSEL

*Hok Ming Chan, pro se,* and *Virginia A. LoPreto* for Hok Ming Chan, appellant.

*Elan Gerstmann* of counsel *(Edward S. Panzer,* attorney), for Ming Li, appellant.

*Morrie I. Kleinbart* of counsel *(Mark Dwyer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

■ Since defendants' right to be present at the trial of this indictment was not violated by their exclusion from the jury room discussion concerning a partial closure of the courtroom during a portion of the complainant's hearing testimony and the resultant closure order was, in the circumstances, an appropriate exercise of discretion, we, unlike our dissenting colleagues, see no need for a remand and new suppression hearing. Inasmuch as the other issues raised by defendants lack merit, we affirm the conviction.

To put the issue in proper perspective, a brief summary of the nature of the prosecution is in order. In the fall of 1990, Fang Kin Wah, residing in Foo Chow Province, China, agreed to pay $25,500 to a Mr. Zhang, whom he met in Bangkok, to smuggle him into the United States. The necessary arrangements were made and Fang arrived in New York City, joining his wife as an employee at a restaurant owned by his wife's brother and located at 92 Third Avenue in Manhattan. In October 1990, a group of men, including one Mei Zheng and the defendant-appellant Chan, came to the restaurant and demanded the money Fang had promised to pay. Fang borrowed $5,500 from his brother and paid it to the group. Fang was subsequently threatened on a number of occasions if he did not pay the balance.

On December 31, 1990, at about 10:30 P.M., Mei Zheng and defendants Chan and Li appeared at the restaurant and

dragged Fang outside, turning him over to two other Asian men he had never seen before. One of the men gave Fang's wife a beeper number which she was to call. With Mei Zheng driving, Fang, accompanied by the two other men, was driven to Delancey Street. There, the two other men left and were replaced by defendants Li and Chan. Fang, accompanied by his three captors, was then driven to a second floor apartment at 2327 Arthur Avenue in the Bronx, where Zhang, accompanied at one point by 10 other Asian men, demanded the money owed. Fang explained that he was in the process of obtaining a bank loan.

After Zhang left, never to be seen again, defendants Li and Chan and Zheng began beating Fang, one with a gun, another with a hammer, and the other with his fists. The captors called Fang's wife at the restaurant with a $30,000 ransom demand. The beatings resumed after the telephone call. Eventually, the kidnapping was reported to the police, who, using the telephone number Fang's captors had provided in response to a call to the beeper number they had given Fang's wife, were able to trace Fang and his captors to the Arthur Avenue address. Fang was rescued and the 24 Asians found in the building were removed therefrom and detained.

From photographs taken of the detainees, Fang was able to recognize 13 of these individuals as having been in the apartment. Eventually, in a corporeal identification procedure, he picked out the same 13 individuals he had identified in the photographic procedure, including defendants Chan and Li and Zheng. These three and three others were charged in the kidnapping. Defendants Li and Chan and Zheng, all of whom were convicted, were tried together with one Zhan, who was acquitted. As to the two others, one pleaded guilty to attempted kidnapping in the second degree and the charges against the sixth defendant were dismissed on the People's motion.

Returning to the courtroom after a luncheon recess declared during his cross-examination at the suppression hearing, Fang saw a group of Chinese men standing outside in the hallway. He became quite upset and agitated. As a result, the Trial Judge, prosecutor, three defense attorneys, Fang and the interpreter convened in the jury room, where Fang immediately blurted out, "They want to kill me". Attempting to calm Fang, the Trial Judge told him that he didn't "know whether these people are here to try to intimidate [him] or not, but * * * if there is any evidence whatsoever that these people who happen to be Oriental * * * they will leave the courtroom

when I go back out there." He then asked Fang if he had "seen these people in the courtroom?"

The prosecutor interjected that he had not expected such a reaction, but that "when he brought Mr. Fang out of the courtroom, all these people were standing outside the courtroom and staring at Mr. Fang as he walked through, and immediately got him out of the area, and that's when he started this." It was at that point, the prosecutor confirmed in response to the court's question, that Fang became "emotionally upset." After the court assured Fang that no one present in the jury room was responsible for putting the men in the hallway, counsel for Zheng and Li stated that he had not heard that anyone said anything to Mr. Fang in the hallway. After the prosecutor noted that "[a]ctions spoke louder than words outside the courtroom", counsel repeated that nothing he had heard justified Fang's reaction and questioned the genuineness of "this purported reaction".

When the Trial Judge commented, "Maybe I'll try and get it out of him", Fang responded, "Why let so many people come in? Why so many come in. Before nobody." When the Judge asked Fang whether he knew "these people," Fang replied, "All Chinese guys. Dangerous men, Chinese men, dangerous." The Judge inquired as to whether "they had something to do with what you feel happened to you" and Fang replied, "Yes, exactly." In response to the court's further inquiry, Fang confirmed that he believed that the Chinese men outside the courtroom were part of the group that had kidnapped him.

When asked by Zhan's counsel whether he recognized "some of the people from that night," Fang replied that he did not. The court then asked Fang what he meant when he described the men as dangerous. Fang replied that the men were together outside the courtroom and that they had a "direct relationship", which he characterized as a group relationship, with the men on trial.

The Trial Judge, at that point, noted for the record that Fang appeared to be crying and was "extremely upset". Counsel for Zheng and Li described Fang's reaction as "hyperventilation". When the Judge suggested that he might exclude the men from the courtroom, Fang stated, "I'm going to identify them. I'm going to sue them. I'm going to die. I don't wish anybody to go through what I did." The Judge offered to exclude the men. Fang responded, "The threat is already there."

When Chan's attorney asked that the proceedings continue outside the presence of Fang since any further discussion would

likely upset him even more, the Judge asked Fang to leave, assuring him that the court officers would protect him. Before leaving, Fang asked, "Who asked them to come in the courtroom * * *. They are sending some people to come to the court to kill me. They want to kill me and my family." When the Judge explained that the law required the courtroom to be open to everyone, Fang responded, "This is more threatening than just a kidnapping. My whole family. I'm worried about my family. Who is going to believe in this U.S. law?" Just before Fang was dragged from the jury room, he concluded by saying, "After I testify, I'll be dead. They will make sure I die".

A lengthy colloquy followed in which counsel for Zheng and Li, noting that the men gathered in the hallway outside the courtroom may merely have been friends and relatives of the defendants, repeated his view that there was no basis for an exclusion order. Chan's attorney asserted that on his return to the courtroom after lunch he had observed a number of Chinese men who may have been related to the defendants but had seen nothing untoward that would have provoked Fang's reaction. The prosecutor, noting that he himself had seen Fang's face turn color when he first observed the men outside the courtroom, asked the court to assess the validity of Fang's fear on the basis of its own observations.

The court concluded that Fang was genuinely fearful that someone was going to kill him and, with the observation that no one would own up to making threats, rejected a suggestion by Zhan's counsel that it inquire of the men. Counsel for Zheng and Li then announced that he recognized some of the men outside the courtroom as friends and relatives of Zheng. The court finally determined that it would exclude the men from the courtroom for the remainder of Fang's hearing testimony because "it would be prejudicial to the People at this moment, when we are at least a third of the way through [his] testimony to have him capitulate because of fear of people, some of the people who are seated in the courtroom. Very candidly I'm not sure he is going to testify at all any more if I throw everybody out of the courtroom." Before Fang resumed his testimony, he stated his promise to write to the Federal authorities about the threat he had received that day, adding that, if he were to die after leaving the courtroom, he "can say they did it."

New York confers upon a defendant at the trial of a criminal charge a right to be present broader than that guaranteed by the Federal Constitution. (*People v Sprowal*, 84 NY2d 113, 117.) Under the latter, a defendant has a right to be present at

any stage where evidence of the charges is being presented (*supra,* at 116-117, citing *Kentucky v Stincer,* 482 US 730, 739) or at any stage critical to the outcome of the trial where the defendant's presence might bear a substantial relationship to his opportunity to defend himself (*Kentucky v Stincer, supra,* at 745-746; *People v Sprowal, supra,* at 117), stages which the Court of Appeals has identified as "core" proceedings (*People v Morales,* 80 NY2d 450, 455-457).

CPL 260.20, which provides that a defendant "must be personally present during the trial of an indictment", has been construed to confer a right to be present at a variety of "ancillary" proceedings as well (*People v Morales, supra,* 80 NY2d, at 456; *People v Sprowal, supra,* 84 NY2d, at 117), "so long as the defendant can potentially contribute to the proceeding." (*Supra,* at 118.) Such proceedings include hearings on a defendant's suppression motion (*People v Morales, supra,* 80 NY2d, at 456), inasmuch as the defendant might have peculiar factual knowledge which would enable him to advise counsel of any error or untruth in the witnesses' testimony. (*People v Anderson,* 16 NY2d 282, 287.)

Defendants, of course, were present during that portion of Fang's cross-examination where the courtroom was partially closed. What is challenged is their absence at a proceeding secondary to the ancillary suppression hearing, i.e., the jury room colloquy about whether the men in the hallway outside the courtroom would be excluded for the balance of Fang's hearing testimony. Since the outcome of that secondary proceeding could have had no impact whatever on the determination reached in the ancillary proceeding itself—that Fang's identifications were not the product of any undue suggestiveness—defendants' presence at that proceeding would have been wholly superfluous. (*See, e.g., People v Favor,* 82 NY2d 254, 268.) Although the hearing was a combined hearing on motions to suppress physical evidence and identification testimony, only the court's identification ruling is challenged on appeal. Defendants' presence at the colloquy concerning closure would have made no difference to the persuasive proof, already elicited from other witnesses in an open courtroom, that Fang's identifications were free from the taint of undue suggestiveness.

Nor would defendants' presence have had an impact even on the decision to exclude the hallway visitors. The court took no testimony and made its determination on the basis of its own observations of Fang and his reaction to seeing the group of

men, not courtroom spectators up to that point, outside the courtroom after a luncheon recess. Defendants had not witnessed that confrontation and had nothing to contribute to the discussion that could not be argued by counsel. Their " 'peculiar knowledge' about the identities of some of these people", cited by the dissent as a contribution defendants could have made to the jury room proceeding, is, in the context of the court's ruling, an irrelevancy. The court made no finding, implicit or otherwise, in this regard. To the extent that it was considered at all, counsel for defendants Zheng and Li conceded that some of the men outside the courtroom were friends and relatives of Zheng.

■ Nor, in the circumstances, did the partial courtroom closure deny defendants their constitutional and statutory right to a public trial (*see*, US Const, 6th Amend; *In re Oliver*, 333 US 257, 267; Civil Rights Law § 12; Judiciary Law § 4), a right that applies to suppression hearings as well as to a trial (*Waller v Georgia*, 467 US 39, 46). That right, however, has " 'never been viewed as imposing a rigid, inflexible straitjacket on the courts.' " (*People v Hinton*, 31 NY2d 71, 74, *cert denied* 410 US 911.) While the power is to be exercised "sparingly", and "only when unusual circumstances necessitate it" (*supra*, at 76; *People v Kin Kan*, 78 NY2d 54, 57), trial courts, for a variety of reasons, have the discretionary authority to exclude the public from the courtroom. (*People v Martinez*, 82 NY2d 436, 441; *People v Jones*, 47 NY2d 409, 413, *cert denied* 444 US 946.)

It goes without saying that before a courtroom may be closed, there must be a "factual showing that an exception to the norm of a public trial was justified." (*People v Jones, supra*, 47 NY2d, at 415.) It has repeatedly been held that a threat to harm a witness justifies closing the courtroom during that witness's testimony. (*See, e.g., People v Parker*, 193 AD2d 571, *lv denied* 82 NY2d 757; *People v Ortiz*, 173 AD2d 189, *lv denied* 78 NY2d 1129.) Temporary exclusion has been allowed to permit an immature or emotionally disturbed witness to testify. (*People v Jelke*, 308 NY 56, 63; *see also, People v Morin*, 96 AD2d 1135, *lv denied* 60 NY2d 969.)

Here, the court, after a full and fair inquiry in which counsel for the parties were given ample opportunity to record their observations and views, ordered the courtroom closed to the men gathered outside in the hallway. It did so on the basis of Fang's fear, which the court found to be genuine, of Chinese gang members. Fang repeatedly referred to threats to himself

and his family and stated that he expected to be killed after he testified. When the court offered to exclude the Chinese men, Fang stated, "The threat is already there." Fang insisted that the men were being sent to the courtroom to kill him and his family, a concern he expressed even after the court explained that the law required that the courtroom remain open.

Irrespective of whether these perceived threats could be tied to the men outside the courtroom, Fang's belief that the connection existed and his acute emotional reaction upon seeing the group of Chinese men outside the courtroom justified closure. As the trial court had observed, Fang was crying and hysterical as a result of seeing them. His reaction was so extreme that he had grabbed onto the table in the jury room when the Trial Judge asked him to step out; it took three or four officers to remove him.

The dissent concludes that the witness's subjective fear is insufficient to justify the limited closure ordered here and suggests that objective proof of threats or other danger is required. Neither case law nor logic compels such a showing. Indeed, "[a] number of courts have held that [a witness's fear of testifying] is a proper basis for excluding spectators from a trial." (*United States v Eisner*, 533 F2d 987, 993, *cert denied* 429 US 919; *see also*, *United States v Sherlock*, 962 F2d 1349, 1357, *cert denied sub nom. Charley v United States*, 506 US 958; *United States ex rel. Bruno v Herold*, 408 F2d 125, *cert denied* 397 US 957; *Geise v United States*, 262 F2d 151, *cert denied* 361 US 842; *United States ex rel. Smallwood v LaValle*, 377 F Supp 1148, *affd* 508 F2d 837, *cert denied* 421 US 920.) In none of the cited cases was there objective proof that the witness was in physical danger.

In this case, particularly, it was appropriate to order partial closure "without evidence of a direct threat or other evidence corroborating [the witness's] subjective fears" (*United States v Doe*, 63 F3d 121, 130) since this is one of "those cases involving criminal organizations in which a judge may reasonably infer the courtroom presence of interested parties with a motivation to retaliate against the witness." (*Ayala v Speckard*, 89 F3d 91, 96,[1] *on reh* 102 F3d 649; *see also*, *United States v Doe, supra*, 63 F3d, at 130.)

---

1. It is true that in *People v Lugo* (233 AD2d 197, which upheld closure of the courtroom during the testimony of an undercover officer, this court refused to follow *Ayala v Speckard (supra)*, which held that courtroom closure during the undercover's testimony violated defendant's constitutional rights. (*See also*, *People v Brown*, 235 AD2d 344; *People v Ford*, 235 AD2d 285.) But

Limited closure was particularly appropriate here since, as the trial court noted, "[I]t would be prejudicial to the People at this moment, when we are at least a third of the way through [Fang's] testimony to have him capitulate because of fear of people, some of the people who are seated in the courtroom." As the court further observed, it was not at all a certainty that Fang would continue his testimony even if the court were to exclude everyone from the courtroom. By demonstrating that Fang would not testify unless these men were excluded, the People presented a " 'substantial reason,' "[2] i.e., the need for a witness to testify, sufficient to demonstrate that defendants' right to a public trial has not been violated. (*Woods v Kuhlmann*, 977 F2d 74, 76.)

Nor would further inquiry as to the identity of the excluded men have led to any other result. While such inquiry might have determined that they were friends and relatives of at least one of the defendants, a fact conceded by counsel for Zheng and Li at least as to some of the spectators, such determination would not have excluded the possibility that they posed a threat to Fang and thus eliminated Fang's fear.

It should also be noted that, although counsel for the acquitted codefendant Zhan made a request to ascertain the identity of the men in the hallway, defendants-appellants did not. Thus, by virtue of their failure to do so, their claim that such inquiry was required is unpreserved. (*See, People v Martinez*, 82 NY2d 436, 444, *supra; People v Morales*, 216 AD2d 175, *lv denied* 86 NY2d 845.)

Nor, as argued, was the closure order any broader than necessary to protect the State's interest in having Fang, free of intimidation, complete his testimony. The order excluded only those as to whom Fang expressed a fear and affected only the

*Ayala* is cited here not for its result; it is cited for a much more limited purpose. The opinion recognized that closure might be appropriate even without a direct threat when the case involved a criminal organization.

2. When a Trial Judge orders a total closure of a court proceeding at the request of one party, the moving party must advance an "overriding interest that is likely to be prejudiced." (*Waller v Georgia*, 467 US 39, 48, *supra*). Several of the Federal circuit courts of appeals, including the Second Circuit, have held that where a partial rather than a total closure is involved, a "substantial reason" is sufficient to justify the closure. (*See, e.g., Woods v Kuhlmann, supra*, 977 F2d 74, 76, 77 [closure upheld where the witness was " 'scared to death' " to testify because of threats by a family member and had " 'clammed up' " at the mere sight of the family]; *see also, United States v Osborne*, 68 F3d 94, 98-99.)

remainder of Fang's hearing testimony. (*See*, *People v Guzman*, 176 AD2d 561, 563, *lv denied* 78 NY2d 920; *see also*, *People v Badillo*, 207 AD2d 742, *lv denied* 84 NY2d 1009.)

■ We also affirm the denial of defendant Li's motion to vacate the judgment. The record on the CPL 440.10 motion establishes that Li and Zheng were adequately advised of the risks of joint representation. (*See*, *People v Gomberg*, 38 NY2d 307.) In any event, defendant has failed to demonstrate "a significant possibility" of a conflict of interest which "operated to his detriment and bore a substantial relation to the conduct of his defense." (*People v Torres*, 224 AD2d 269, 270, *lv denied* 88 NY2d 943, citing *People v Recupero*, 73 NY2d 877, 879.)

Accordingly, the judgments of the Supreme Court, New York County (Howard Bell, J.), rendered February 7, 1992 and July 10, 1992, convicting defendants Li and Chan, respectively, after a jury trial, of kidnapping in the first degree, and sentencing them to terms of 20 years to life and 22 years to life, respectively, should be affirmed. The order of the same court and Justice, entered on or about June 30, 1994, denying defendant Li's motion to vacate the judgment of conviction pursuant to CPL 440.10, should be affirmed.

ROSENBERGER, J. (dissenting). During the suppression hearing, a large group of Asian men was in the courtroom after the lunch recess. The court then conducted a colloquy with counsel, the prosecutor and the complainant, who was scheduled to continue with his cross-examination, about whether the spectators should be excluded from the courtroom. The court erred in conducting such an inquiry in the absence of defendants, particularly since they had "peculiar knowledge" about the identities of some of these people (*People v Dokes*, 79 NY2d 656, 660; *People v Turaine*, 78 NY2d 871), which presumably could have contributed to the resolution of the court's explicit concern about determining "who these people [were]" before making the decision to exclude them from the proceedings (*People v Sprowal*, 84 NY2d 113, 118). The Asian people who were excluded from the courtroom included members of a codefendant's family and others who had been present at prior proceedings. Significantly, the case had received wide attention in the New York Chinese press, and the courtroom is located in Chinatown.

In addition, the court did not discharge its duty to make findings adequate to support the closure order, as required by *Waller v Georgia* (467 US 39, 48) and *People v Martinez* (82

NY2d 436, 442). A review of the record, which even the trial court characterized as "very sparse", reveals that the court's *sua sponte* closure order was improperly based upon the witness's subjective fear of these spectators, not upon objective proof of threats made or other danger posed by them (*cf., People v Montgomery*, 205 AD2d 259, 261-262, *affd* 88 NY2d 1041; *People v Parker*, 193 AD2d 571, *lv denied* 82 NY2d 757). It is also significant that the witness was in a protection program, that he no longer resided in the city and that, despite his testimony that he thought the spectators were involved in his kidnapping, he admitted that he did not recognize any of them other than from seeing them in the hall outside the courtroom (*People v Hinton*, 31 NY2d 71, 75-76, *cert denied* 410 US 911; *People v Kin Kan*, 78 NY2d 54; *People v Gutierez*, 86 NY2d 817). The majority, in its analysis of the witness's subjective fear and lack of evidence of direct threat as factors, relies entirely on Federal cases, rather than any from New York State.

Since the hearing was conducted in the absence of the defendants, and adequate findings were not made, I respectfully dissent, and would hold the appeal in abeyance and remit the matter to the Supreme Court, New York County, for a new suppression hearing.

RUBIN and NARDELLI, JJ., concur with SULLIVAN, J.; MURPHY, P. J., and ROSENBERGER, J., dissent in a separate opinion by ROSENBERGER, J.

Judgments, Supreme Court, New York County, rendered July 10, 1992 and February 7, 1992, and order, same court and Justice, entered on or about June 30, 1994, affirmed.