723 A.2d 922

**Daryl Antjuan WALKER**

v.

**STATE of Maryland.**

**No. 514, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Feb. 10, 1999.

David M. Simpson, Greenbelt, for appellant.

Rachel Marblestone Kamins, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General, Baltimore, and Jack B. Johnson, State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before MURPHY, C.J., and HOLLANDER and VICTOR K. BUTANIS (Specially Assigned), JJ.

HOLLANDER, Judge.

This appeal arises from an assault committed upon Daryl Antjuan Walker,[1] appellant, by a State's witness during a pretrial hearing on appellant's motion to suppress a photographic identification. The attack briefly spawned chaos, confusion, and commotion in the courtroom, and culminated in a closure order barring appellant's mother, sister, and girlfriend (collectively, the "family") from attending the suppression hearing and the trial. Because the courtroom was

---

1. In the transcript, appellant's first name is spelled "Daryle."

equipped with video cameras, in lieu of a court reporter, the incident was captured on videotape.

On February 28, 1998, a jury in the Circuit Court for Prince George's County convicted appellant of robbery with a deadly weapon, two counts of first degree assault, and three counts of use of a handgun in the commission of a felony or crime of violence.[2] The court subsequently sentenced appellant to a total of twenty-five years in prison.[3] On appeal, only matters arising from the courtroom fracas are at issue. Appellant presents the following questions for our review, which we have rephrased:

I. Did the trial court abuse its discretion and violate appellant's constitutional right to a public trial when it issued a closure order barring appellant's family from the trial, because of the family's behavior in response to an assault upon appellant committed by a State's witness during a pre-trial motion hearing?

II. Did the trial court abuse its discretion when it denied appellant's request for a continuance of the trial after a courtroom disturbance that occurred while the jury was sequestered in the jury room?

For the reasons that follow, we conclude that the trial court abused its discretion in excluding appellant's family from the trial.[4] Further, we hold that the closure order violated appellant's constitutional right to a public trial. Accordingly, we

---

**2.** The jury found appellant not guilty of attempted second degree murder and a related handgun charge.

**3.** Specifically, the court imposed the following sentences: (1) twenty years in prison for the robbery with a deadly weapon of Earl Watkins; (2) a consecutive sentence of five years, without parole, for a related handgun offense; (3) ten years, concurrent, for the offense of first degree assault of Mr. Watkins; (4) a concurrent term of five years, without parole, for another handgun offense; (5) a concurrent sentence of ten years for the first degree assault of Sherre Burton; and (6) a concurrent sentence of five years, without parole, for a related handgun offense.

**4.** Because appellant has not asserted that the closure order warrants a new suppression hearing, we need not consider that issue.

shall reverse the convictions and remand for further proceedings. In view of our disposition of the first issue, we need not reach appellant's second issue.

## I. The Videotape: A Picture Is Worth A Thousand Words

This case presents a situation created by "emerging technologies that are fast becoming a part of the trial process." *Ringe v. State*, 94 Md.App. 614, 625, 618 A.2d 266 (1993). In this era marked by the importance of the "visual image"[5] and "dizzying television technology",[6] it happened that video cameras, rather than a court reporter, were utilized to make a record of the trial proceedings. Although a transcript of most of the videotaped court proceedings has been submitted for our review, no transcription of the melee was prepared; clearly, it would have been almost impossible to prepare such a transcript. Accordingly, the videotape of the court proceedings, including the fracas, has been included as part of the record on appeal, pursuant to this Court's order of October 14, 1998. *See generally* Md. Rules 8–415, 16–405, 16–406. While the transcript contains the trial judge's post-event summary of what occurred, the videotape provides the only contemporaneous account of the courtroom disturbance.

The trial judge was one of several eyewitnesses to the underlying occurrence, but she was the only witness who recounted what happened. Moreover, the family members were not provided with an opportunity to explain their conduct, which was provoked by the attack upon appellant and prompted the closure order. In a sense, the judge relied on her own credibility and reliability as a witness in determining to issue a closure order. Thus, this case pits the videotape of the courtroom disturbance against the transcript, which contains the trial judge's observations.

---

5. D. Zurawik, "Television news fails to deliver the full picture", *The Sun* (Dec. 20, 1998), at 28A.

6. *Id.*

The parties have not raised any concerns about our review of the videotape, nor have they suggested any factors that should guide our consideration of it. To be sure, we are concerned about the potential misuse of a videotape of the proceedings as a vehicle for "instant replay," opening the door to the proverbial "Monday morning quarterbacking" regarding the trial judges fact-finding. Indeed, we are mindful that even when an umpire or a referee makes a "bad call" that is plainly evident on replay, the call is not overruled. Yet this is not a game, and we cannot disregard a vital part of the record. Instead, we are required to determine from our review of the *entire* record whether the judge's findings of fact, undergirding the closure order, were clearly erroneous. *See Jones v. State*, 343 Md. 448, 457–58, 682 A.2d 248 (1996); Md. Rule 8–131(c).

When the factual findings of the trial court are supported by substantial evidence, they are not clearly erroneous. *Ryan v. Thurston*, 276 Md. 390, 392, 347 A.2d 834 (1975); *Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners of Sea Watch Condominium*, 115 Md.App. 5, 31, 691 A.2d 750, *cert. granted*, 347 Md. 253, 700 A.2d 1214, *and cert. dismissed*, 347 Md. 622, 702 A.2d 260 (1997). Our review is limited to determining "only whether there was sufficient evidence to support the trial court's findings. In making this decision, we must assume the truth of all evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusions of the lower court." *Mercedes–Benz v. Garten*, 94 Md.App. 547, 556, 618 A.2d 233 (1993) (citation omitted); *see also State v. Johnson*, 108 Md.App. 54, 71, 670 A.2d 1012 (1996).

Our research reveals that numerous courts, in Maryland and elsewhere, have readily considered videotapes without offending the well-established principles that govern appellate review. In *Suggs v. State*, 87 Md.App. 250, 589 A.2d 551 (1991), for example, we considered the propriety of the trial judge's conduct in analyzing whether the defendant received a fair trial. To determine what actually occurred in

front of the jury, we specifically reviewed the videotape of the court proceedings, noting:

> Appellant's counsel, at oral argument, stated that the video-tape of the proceedings showed that the jury was still in the courtroom. *We have reviewed the tape, and he is correct.*

*Id.* at 257 n. 2, 589 A.2d 551 (emphasis added).

Similarly, in *Ringe,* 94 Md.App. 614, 618 A.2d 266, we considered a videotaped confession offered in evidence at a suppression hearing. Writing for this Court, Judge Cathell said that "review of the video tape [sic] may be even more necessary when appellate judges are required to make independent appraisals of constitutional issues." *Id.* at 623, 618 A.2d 266. *See also, e.g., In re Adoption/Guardianship No. 3598,* 109 Md.App. 475, 516, 675 A.2d 170 (1996) (finding no support for trial court's conclusion that appellant's home was "less than desirable," based on appellate review of videotape introduced in evidence), *rev'd on other grounds,* 347 Md. 295, 701 A.2d 110 (1997); *J.F.E. v. J.A.S.,* 930 P.2d 409, 412 (Alaska 1997) (discussing appellate court's review of videotape and photographs introduced as exhibits in connection with visitation dispute and concluding they did not "furnish a sufficient basis for the court's decision to restrict [father's] visitation privileges"); *Noland v. Noland,* 330 Ark. 660, 956 S.W.2d 173, 178–79 (1997) (reviewing, *inter alia,* videotaped interview of decedent and his execution of trust and concluding that "trial court clearly erred in finding that the appellants failed to establish [decedent's] soundness of mind," because videotape "manifestly depicts a man who essentially knew what he was doing in signing the documents."); *State v. Moncrief,* 234 Ga.App. 871, 508 S.E.2d 216 (1998) (reviewing audio/videotape of car stop and reversing trial court's order granting defendant's motion in limine on the basis of alleged deficiency of warnings); *Montoya v. State,* 232 Ga.App. 24, 499 S.E.2d 680, 683 (1998) (reviewing the videotape of a car stop and ruling that trial court correctly denied suppression motion); *State v. Aubin,* 100 N.C.App. 628, 397 S.E.2d 653 (1990) (reviewing videotape and upholding trial court's findings of fact); *Commonwealth v. Lease,* 703 A.2d 506 (Pa.Su-

per.Ct.1997) (reviewing videotape from burglar alarm protection system and concluding evidence was sufficient to support burglary conviction); *Cooper v. State*, 961 S.W.2d 222, 226–27 (Tex.Ct.App.1997) (reviewing videotape in connection with motion to suppress videotape made at police station and concluding that trial court erred in admitting audio portion of videotape because defendant invoked his right to terminate interview); *Perkins v. State*, 940 S.W.2d 365 (Tex.Ct.App. 1997) (concluding that videotape made shortly after defendant's arrest "demonstrated that Appellant was not intoxicated" and reversing conviction following bench trial on ground that "finding of intoxication is so against the great weight [of evidence] as to be unjust and manifestly wrong."); *Commonwealth v. Benjamin*, 28 Va.App. 548, 507 S.E.2d 113 (1998) (upholding trial judge's determination that defendant did not waive constitutional rights, based on independent appellate review of videotape of custodial interrogation); *State v. Peterson*, 588 N.W.2d 84 (Wis.Ct.App.1998) (reviewing videotape and concluding that trial court erroneously excluded it from evidence).

We have uncovered only one appellate court that expressly declined to review a videotape of trial proceedings. In *Moustakas v. Dashevsky*, 25 Cal.App.4[th] 752, 754, 30 Cal.Rptr.2d 753, 754 (1994), the court did not want to engage in its "own evaluation of the sights and sounds of the trial courtroom." In that court's view, consideration of the videotape represented a "drastic change" in "[m]any aspects of the time-honored rules limiting the scope of appellate review...." *Id.* Further, the court believed that it contravened the trial judge's function "to see and hear witnesses, attorneys, and jurors." *Id.* As we see it, the California appellate court overlooked the equally important responsibility of an appellate court to apply the clearly erroneous standard to the trial judge's fact-finding. *See* Md. Rule 8–131(c).

Accordingly, our factual summary of the courtroom disturbance derives from both the transcript and the videotape. Were it not for the video cameras, our understanding of the events that unfolded in the courtroom would necessarily have

been limited to the oral account provided by the judge. Because the record includes the videotape, however, we need not rely solely on the judge's rendition of events. Through the lens of the video cameras, it is as if we, too, were eyewitnesses to the disturbance; the videotape enables us to see for ourselves what happened in the courtroom.

Although we recognize that video cameras are not without limitations, the video cameras that were used in the courtroom, were not "static."[7] Thus, they did not merely capture a "thin slice"[8] of what occurred. Rather, the video cameras captured the details of the incident in a way that an ordinary eyewitness understandably could not. Further, quite unlike an actual eyewitness caught in the frenzy of the moment, we have been able to scrutinize, analyze, and repeatedly review the videotape, and we have done so in the calm, dispassionate milieu afforded to an appellate court. Our review has also benefitted from technological aids, such as slow motion and the use of freeze frames. We remain mindful, however, that even when two or more people witness the same incident, they "may see or hear it differently." Aaronson, *Maryland Criminal Jury Instructions and Commentary*, § 2.06, at 77 (2d ed.1988) (citing, *inter alia*, DeVitt and Blackmar, *Federal Jury Practice and Instructions*, § 17.01 (3d ed.1977)).

After scrutinizing the videotape and the transcript, it is evident to us that the trial judge's summary of facts—the only first hand account provided to us—did not correspond in all material respects with what the video cameras recorded. In reaching our conclusion, we are satisfied that our review has not encroached upon the trial judge's exercise of her fact-finding duties. Instead, we have endeavored to fulfill our responsibility to determine whether the trial judge's factual findings were clearly erroneous.

---

7. *Id.*

8. *Id.*

58

## II. Factual Summary

### A. Facts Pertinent to the Charges[9]

At around 3:00 a.m. on January 30, 1997, while Earl Watkins and his girlfriend, Sherre Burton, were watching television in the living room of Ms. Burton's Capitol Heights apartment, appellant and a few other men made an uninvited entry into the apartment. Brandishing handguns, which the men pointed at the faces of the two victims, the assailants robbed Watkins of over $100.00.[10] Appellant also kicked Watkins in the head.

In the meantime, Officers Piazza and Butcher responded to a 911 call that Watkins had made when he first heard the sound of breaking glass. As the officers approached the apartment building, a man yelled "police," and the robbers fled the scene. According to Detective Gregory McDonald, the police recovered $340.00 that the robbers left scattered at the crime scene.

After the robbery, Watkins told Detective McDonald that he knew one of the assailants from the area, and identified him as "Daryl." In a photographic array subsequently shown to Watkins by Sergeant Mark Ciccone, Watkins positively identified appellant as one of the robbers. According to Sergeant Ciccone, Ms. Burton selected two photographs of the person she knew as "Daryl." One of the photographs was that of appellant. At the time, Ms. Burton indicated that the people in the photographs looked "familiar" and "[i]t could be him."

At trial, Watkins explained that he recognized appellant because he had seen him at the building "all the time." Moreover, on the night in question, Watkins said that he stood "very close" to appellant. According to Watkins, Walker

9. In view of the issues presented, we need not recount, in detail, the facts pertaining to the underlying criminal charges.

10. The evidence at trial was not entirely clear as to the precise number of assailants or the exact amount of money that was taken. We note that the application for statement of charges indicated that appellant and his accomplices "stole $2,500.00 in U.S. currency."

stood "right in front" of Watkins, with only Walker's gun obstructing the victim's vision. Ms. Burton stated that she had only "glanced" at the robbers, and the robbers instructed her not to look at their faces. Indeed, one of the assailants wrapped a towel around Ms. Burton's head and put her in a closet. Therefore, Ms. Burton was not asked if she could identify appellant as one of the robbers.

## B. Facts Pertinent to Issue I

The incident occurred shortly after the conclusion of *voir dire*. At the time, the jurors, who were not yet sworn, were sequestered in a jury room adjacent to the courtroom, because the court was to begin the suppression hearing concerning the pretrial photographic identification of appellant. The videotape reveals that appellant was seated at the trial table next to his counsel, and four people were seated on two benches in the public seating area of the courtroom. Three of the spectators have been identified as appellant's mother, sister, and girl-friend, although we do not know who is who. The fourth person, seated behind them, has not been identified for us. Several court personnel were also present in the courtroom, including two uniformed sheriff's deputies. Nevertheless, the precise number of court personnel and their specific duties is not made clear in the record. The videotape also shows a rail separating the well of the court from the public seating area, in what seems like a rather small courtroom. An aisle divided the public seating area into two sections, and the spectators were all seated on the same side as appellant.

The State began by calling Watkins as its first witness. The videotape indicates that, moments later, at approximately 11:38:52 a.m., Watkins walked past appellant and suddenly slugged him. Until that time, however, there is no indication that anyone had engaged in any disorderly or unruly conduct while in the courtroom.[11] As a result of Watkins's attack, a

---

11. We observe, however, that at the beginning of the suppression hearing, the trial court commented about threats to the witnesses. The court stated: "It has also been called to this Court's attention that there

**60** 

fracas of sorts ensued, which is described in one sentence in the transcript. It says: "(An altercation erupted in the courtroom between the witness and the defendant.)"

The videotape reflects that many of the responses of those in the courtroom occurred simultaneously. A sheriff's deputy and another man, presumably a bailiff, immediately responded by grabbing Watkins and pulling him away from appellant. They quickly took Watkins to the side of the courtroom, next to the rail. As they did so, the prosecutor managed to scoot out of the way. Unfortunately, Watkins seemed to land on top of another member of the court's staff. When appellant was struck, he stood up and seemed to turn in the direction of the public seating area, towards his family. As he did so, his attorney put his arms on appellant, as if to restrain him or calm him. In the meantime, another sheriff, who had been in the public seating area of the courtroom, quickly came past the rail and seemed to tackle appellant, although Watkins had already been separated from Walker and removed to the side. As the sheriff grabbed appellant, his family got up from their seats, gesturing, with one of them screaming repeatedly, "Oh my God." Additionally, one of the women approached the nearby rail, while another paced up and down the courtroom. None of the spectators ever entered the well of the court, however. As the family was yelling, the court repeatedly said, "get out." But the judge never expressly indicated that she was speaking to the family. By 11:39:22 a.m., the family vacated the courtroom. Thereafter, noise continued to emanate from the hallway.

We cannot ascertain from the record who approached the rail or repeatedly screamed "Oh my God." Because no testimony was ever taken to establish which family member did what, or why they behaved as they did, there is no evidence as to precisely when the family first heard the judge's directive to leave the courtroom or when they first understood that her

---

have been some lightly veiled or assumed threats against the witnesses in this case." The judge never explained the comment further, and no other information has been provided to us.

instruction was directed to them. Instead, we know only that the judge believed, based on "eye contact" with the family during the frenzy, that the family members knew that they had been ordered to leave but did not do so.

In any event, as a result of the incident, the court barred appellant's family from the courtroom for the duration of all court proceedings. For his part, Watkins was charged with two counts of criminal contempt; one count related to striking appellant and the other related to fighting with court personnel. Moreover, the court ordered Watkins's immediate incarceration, and he remained jailed during the trial. Following appellant's trial, the court sentenced Watkins to two consecutive terms of 179 days for each contempt offense.

Immediately after the fracas, the court took a recess. When court resumed about two hours later, appellant's counsel moved to continue both the suppression hearing and the trial. The following colloquy in the transcript is relevant:

[APPELLANT'S COUNSEL]: My client's mother, and girlfriend and sister were here earlier and they were requested to leave the courtroom. I don't know what happened behind me.

THE COURT: They were coming over the rail to get involved in the fracas that occurred, that's why they were asked to leave the courtroom.

[APPELLANT'S COUNSEL]: Your Honor, I believe the jury was in the next room when the incident occurred and I would suspect that they heard some commotion. And I suspect that it could have tainted this jury panel.

They might be assuming that somehow my client was involved in the fight or if they were advised that the alleged victim struck my client that might effect [sic] their view of this case as well, possibly to the detriment of my client.

I think that emotionally—whether the State choose [sic] to see it this way or not, [appellant] is a victim in reference to what happened here today and I think it would be unfair to even have to complete this trial—nor do any motions at

**62**

this point with the person that just struck him merely two hours ago. . . .

* * *

THE COURT: All right. For the record, at approximately 11:38 this morning, after a jury had been selected and sequestered, the first witness was called on a Motion to Suppress an eyewitness identification. The witness came into the courtroom, walked past the defendant. When he became immediately beside the defendant he commenced to pummel the defendant with his fist.

The deputies interceded and got him away from the defendant, who also stood up and decided to get into the affray, and was also subdued and put down. In that accounting, my deputy was injured and had to be taken to the hospital. One of the deputies was also injured. The defendant does not appear to me to have any injuries.

I'm going to go ahead and do the Motion and I'm going to inquire of the jurors if they heard anything. And that's how were going to handle it. I'm not going to continue anything.

[APPELLANT'S COUNSEL]: Your Honor, there is a case *Ronald G. Watters v. State of Maryland* that I believe does make sure [sic] to a public trial, which would include the right of family members to be present during a trial. I know that the Court has indicated that I didn't see what was happening behind me, frankly, but—

THE COURT: I did. I saw everything that happened.

[APPELLANT'S COUNSEL]:—that people came up. I don't know if all three, my client's mother, and the girlfriend and the younger sister all got up. I think it's a natural reaction that if their love one is being pummeled, that they would get up and see what's happening, possibly even defend him. But I think given that the assailant of this morning, will not be in the courtroom of everyone else, that they should certainly be allowed during the testimony. And I think that's the defendant's right under the Sixth Amendment of the United States Constitution and I—

THE COURT: For this record, [appellant's family] left their seats. They approached this rail. They were all yelling. I told them to leave the courtroom and they made eye contact with me and refused to do that, while the deputies were trying to put this affray down and I'm not going to let them in here. If people can't be rulely [sic] in the courtroom and I have to do something like that, this Court is not required to put them in here.

\* \* \*

I'm not going to invite another incident.

The court then proceeded with the motion hearing.[12] After the suppression hearing, and before proceeding with the trial, the judge questioned each juror individually in regard to what he or she may have heard concerning the altercation. Jurors 1, 4, 5, 19, and 37 reported that they heard nothing while they were sequestered. Those jurors who heard noise generally indicated that they would be able to serve impartially and fairly. Juror 8 "heard yelling and shouting and banging coming from this courtroom." Juror 9 heard noise that was described as "extraordinary [sic] loud," but the juror was unable to "distinguish" the words and reached no conclusions. Juror 15 heard "some noise, some loud noise," which the juror "couldn't really make ... out." Juror 17 heard "some female voices screaming" and "sounds similar to a ... chair falling." Juror 22 heard a "rumpus" that "sounded like bodies and furniture falling, and somebody yelling." Further, the juror "speculat[ed] that somebody involved with the trial was upset about something." The juror added: "Family members, whatever." Nonetheless, the juror acknowledged that he/she had no idea what had happened. Juror 30 heard "some commotion," but did not reach any conclusions. Similarly, Juror 38 heard "a commotion," which the juror described as "thumping and a lady yelling."

---

12. After hearing testimony from Watkins, Ms. Burton, Sergeant Ciccone, and Detective McDonald, the trial court denied appellant's motion to suppress the pretrial identification.

Juror 14 reported hearing a "commotion" that sounded like "a lady screaming or some type of outburst." The juror added: "[W]e were trying to decide if we wanted to go out the other door or not." Juror 14 also acknowledged concern about the incident, stating: "I would have to say it unnerved me a little bit." Neither side asked the court to strike Juror 14, however.

Thereafter, the defense attorney renewed his motion to continue the case, and again asked the court to allow appellant's family into the courtroom. Appellant's counsel stated:

It is clear that several of the [jurors] heard a commotion.... There seems to be some consistency that they heard a female voice. My client's mother, my client's girl friend, my client's younger sister are not present in Court at this time. I think this could prejudice my client's case were we to proceed at this time with this jury. Maybe in some of their minds they can be fair and impartial still, but at some point it could have a greater significance when they don't see those people here.

My client should not be punished for being attacked by the complainant in this case, and some of them might infer from that noise that this is a particularly dangerous case, and it might effect [sic] their judgment when it comes down to reaching a verdict.

The other matter was my client does have a right to a public trial.

\* \* \*

I do believe I cited a case earlier. I do believe that my client is entitled to have family members present at critical stages....

Again, the court denied the motion for continuance and refused to permit appellant's family in the courtroom. The following exchange in the transcript is pertinent:

THE COURT: [I]t is obvious that [the jury] heard women yelling. That is what they were doing. They were very loud, and they were approaching the rail. They were going

to get into it. I am not going to let them in here. I saw them do that. Your back was to them, mine wasn't.

[APPELLANT'S COUNSEL]: My concern is that it still could effect [sic] the jury even if the Court were to so find they shouldn't be here, I maintain they should be here. I understand what you're saying. The situation has changed. There is no reason for them to come up during this trial. They can sit in the back, for example, and view the trial itself and the safety of the courtroom could be preserved.

THE COURT: I put them out because they couldn't control themselves. I have no guarantee that if [Mr. Watkins] comes to testify they won't try something, and I am not— I am not going to let them in. Anyone else who wants to come in, it's fine. It's an open courtroom. Those [sic] are not coming in. They couldn't conduct themselves in an appropriate way. I don't have to let them in the courtroom. I am not going to.

Thereafter, the judge informed the jury that "[t]his defendant did absolutely nothing to cause whatever it was you heard." The judge also said: "It was not the defendant's fault. He did absolutely nothing." The jury was then sworn and the case proceeded.

The next day, after Watkins and Ms. Burton had completed their testimony, appellant's counsel renewed his request that the court permit appellant's family to return to the courtroom. Counsel said:

I would make an inquiry of the Court that [the family] be permitted to see the rest of the trial.

My ... reasoning is that ... Earl Watkins and ... Sherre Burton have already testified, and these are people who would be interested in the case. They were here yesterday.

\* \* \*

[W]ould the Court reconsider its decision not to permit the family to view the trial?

The court again denied the request, explaining:

It wasn't the fact of what Mr. Watkins did. It was what they did ... that caused me to remove them from the

courtroom. They can't control themselves. That's my find-
ing, and I'm not going to have them in here.

We had enough of a problem yesterday. Two people got
hurt in here, and I'm not going to risk that again. Don't
ask me again.

We agree with appellant that the videotape does not support
all of the judges factual findings, set forth above, which were
based solely on the judges own recollection as an eyewitness
to the disturbance.[13] For example, it does not appear to us
that either the family or appellant "decided to get into the
affray." If anything, appellant was caught off guard and
seemed quite subdued; there is no indication that he attempt-
ed to strike back at Watkins. Although appellant did rise
from his chair, a law enforcement official immediately ran over
to him and grabbed him, in the presence of appellants family.
At about the same time, appellant's family, visibly upset,
began to scream and move about the courtroom. Because the
public seating area of the courtroom was quite small, it is not
surprising that, in moving about, the women were in the
vicinity of the rail. Yet not one of the women stepped past
the rail separating the public seating area of the courtroom
from the well of the court. Although one of the women
approached the rail, she never took any affirmative action to
embroil herself in the fracas.

Considering that the episode lasted less than a minute, we
are not clear as to the basis for the judge's determination that
the family "refused" to comply with her directive to leave the
courtroom. To be sure, the family members never verbally
indicated that they were unwilling to exit the courtroom.
Although the trial judge repeatedly said "get out" during the
disturbance, and she claimed to have made "eye contact" with
the family, we perceive no factual basis to determine that the
family members immediately heard the judge over their own
screams, or that they immediately realized, in the midst of

---

13. We note that there is no indication in the transcript that the judge
reviewed the videotape before rendering her account of what she
observed.

such chaos, that the judge was actually speaking to them. Moreover, as we said, the family vacated the courtroom in less than a minute.

We shall include additional facts in our discussion.

## Discussion

■ Appellant complains that the trial court violated his constitutional right to a public trial when it excluded his family due to their conduct in response to Watkins's unprovoked attack upon appellant in the courtroom. Although the State conceded at oral argument that appellant's family did not act contemptuously, it maintains in its brief that the trial court did not abuse its discretion in closing the courtroom to "three people who had exhibited an inability to conform their behavior to the decorum of the courtroom...." The State also posits that the judge acted within the bounds of her discretion in imposing a partial closure order, because the order was "narrowly tailored" to the exigencies presented. In this regard, the State points out that the court only barred three individuals from attending the trial, but did not close the courtroom to the entire public.[14] We disagree with the State.

In our view, the courtroom fracas, when considered in light of all the circumstances and the fundamental importance of the right to a public trial, did not justify the broad closure order imposed by the court. Accordingly, we conclude that the trial court abused its discretion when, in violation of appellant's constitutional right to a public trial, it excluded appellant's family from the entire trial. In reaching this determination, it is particularly salient that a more narrowly tailored order could have been crafted to meet the court's concerns. Yet the court did not appear to give any consideration to less restrictive options. It is also significant to us that the closure order was directed solely at appellant's family,

---

14. The videotape suggests that appellant's family was, in essence, the only segment of the public interested in attending the trial. As we noted, only one other spectator was in the gallery when the fracas erupted.

who were personally important to appellant. Additionally, it is noteworthy that the State never sought a closure order to protect any of its interests. We explain further.

"This nation's accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage." *In re Oliver,* 333 U.S. 257, 266, 68 S.Ct. 499, 92 L.Ed. 682 (1948). The right to a public trial evolved from the "distrust for secret trials," *id.* at 268, 68 S.Ct. 499, which "symbolized a menace to liberty." *Id.* at 269, 68 S.Ct. 499. The Sixth Amendment of the United States Constitution embodies the common law principle of the right to a public trial. It provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy. the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...." [15]

The Court of Appeals has acknowledged that "The Supreme Court has ardently protected a criminal defendants right to a public trial...." *Watters v. State,* 328 Md. 38, 44–45, 612 A.2d 1288 (1992)(citing *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and *Press–Enterprise Co. v. Superior Court of Cal.,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)(footnote omitted)). This is because the constitutional right to a public trial "has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver,* 333 U.S. at 270, 68 S.Ct. 499. The right involved here furnishes the public with the opportunity to observe the judicial process, and thus ensures that the "judge and prosecutor carry out their duties responsibly, ... encourages witnesses to come forward and

---

15. Article 21 of the Maryland Declaration of Rights does not include a comparable provision. Nevertheless, the public's right of access to criminal trials "has been part of Maryland legal history since its founding in 1634, "because" the right existed at common law...." *The News American Division, The Hearst Corporation v. State,* 49 Md. App. 422, 427, 431 A.2d 1387 (1981). In *Hearst,* we noted that after "the Revolutionary War, the right to a public trial continued to be vested in the people and the press," pursuant to Article V of the Declaration of Rights, which incorporates rights existing at common law. *Id. See also Dutton v. State,* 123 Md. 373, 386–88, 91 A. 417 (1914).

discourages perjury." *Waller,* 467 U.S. at 46, 104 S.Ct. 2210 (citations omitted); *see Watters,* 328 Md. at 47, 612 A.2d 1288. As the Supreme Court has observed: "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In re Oliver,* 333 U.S. at 270, 68 S.Ct. 499.

■ On the other hand, the accused's right to a public trial is not absolute. The Sixth Amendment does not require a court to forfeit its legitimate and substantial interest in maintaining security and order in the courtroom. To the contrary, prophylactic measures, including closure, may be warranted under some circumstances, in order to maintain order, to preserve the dignity of the court, and to meet the State's interests in safeguarding witnesses and protecting confidentiality. *See Waller,* 467 U.S. at 45, 104 S.Ct. 2210; *Watters,* 328 Md. at 44, 612 A.2d 1288; *Walker v. State,* 121 Md.App. 364, 371, 709 A.2d 177, *cert. denied,* 351 Md. 5, 715 A.2d 964 (1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 803, 142 L.Ed.2d 664 (1998).

■ Although "the right to an open trial may give way in certain cases to other rights or interests," *Waller,* 467 U.S. at 45, 104 S.Ct. 2210, a trial court must exercise its discretionary power to close the courtroom "sparingly and only after [carefully] balancing the competing interests...." *People v. Nieves,* 90 N.Y.2d 426, 660 N.Y.S.2d 858, 683 N.E.2d 764, 766 (1997). The Supreme Court has explained:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press–Enterprise Co.,* 464 U.S. at 510, 104 S.Ct. 819.

■ Several factors have been identified by the Supreme Court with respect to evaluating the proper closure of a court proceeding. These are: (1) a party seeking closure "must

advance an overriding interest that is likely to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the trial court "must make findings adequate to support the closure." *Waller*, 467 U.S. at 48, 104 S.Ct. 2210.

In analyzing the legality of the court's closure order here, the recent case of *Walker v. State, supra,* 121 Md.App. 364, 709 A.2d 177, is instructive. In that case, we considered the propriety of a limited closure of a criminal proceeding in a sexual child abuse case involving two minor victims. The prosecution asked the court to exclude members of the defendant's family from the courtroom during the testimony of the two juvenile victims, because they had expressed fear about testifying against their mother's former boyfriend in the presence of his family. *Id.* at 368–69, 709 A.2d 177. The defendant objected to the prosecution's request, arguing that his family did not pose a threat and it "should be an open proceedings [sic]...." Additionally, the defense noted that the court could have made arrangements for the victims to testify via closed circuit television. *Id.* at 369, 709 A.2d 177. The trial court granted the prosecution's request without asking either witness about the alleged intimidation. *Id.* at 370, 709 A.2d 177.

On appeal, Walker argued that he was deprived of his constitutional right to a public trial. Writing for this Court, Judge Davis specifically acknowledged that the case did not "involve removal of all of the spectators from the courtroom." Nevertheless, after reviewing the Sixth Amendment right to a public trial, we concluded that the lower court abused its discretion in ordering the limited closure. We explained that because court "clear[ed] the courtroom of all of the defendant's *family* members without conducting an examination to ascertain the accuracy or validity of the State's proffer," *id.* at 373, 709 A.2d 177 (emphasis added), we could not determine whether the court's order was "narrowly tailored to the exigencies of the case...." *Id.* at 374, 709 A.2d 177.

*Watters,* 328 Md. 38, 612 A.2d 1288, which involved a complete closure, but only for a limited time, also provides guidance to us. There, a deputy sheriff barred all spectators, including the accused's family, from the courtroom during *voir dire* in a murder trial. Only prospective jurors, witnesses, and courtroom personnel were allowed in the courtroom during that phase of the proceedings. *Id.* at 42, 612 A.2d 1288. After the jury was selected, the defendant learned of the closure and moved for a mistrial. *Id.* at 42, 612 A.2d 1288. At a hearing on that motion, the sheriff's deputy testified that he closed the courtroom because he was concerned that it was too small for the number of people who were interested in the case. *Id.* The deputy admitted, however, that " 'some seats' were available, but he could not estimate how many." *Id.* Finding that the court was closed as a matter of security " 'because of the crowded conditions of the courtroom,' " *id.* at 43, 612 A.2d 1288, and the closure did not infringe the accused's right to a public trial, the lower court denied the motion for mistrial.

The Court of Appeals concluded that there was no compelling need to exclude members of appellant's family, members of the press, and the public from *voir dire* because, by the deputy's own admission, seats were available. *Id.* at 45, 612 A.2d 1288. Moreover, even if there were a "legitimate interest in preventing overcrowding," *id.,* the Court indicated that the exclusion was too broad.

That appellant's *family* was barred from the trial adds an important dimension here. The *Watters* Court specifically acknowledged in *dicta* the harm attendant to excluding a defendant's family from a court proceeding. In that circumstance, the Court recognized "the inability of the defendant's family to contribute their knowledge or insight to the jury selection and the inability of the venirepersons to see the interested individuals." *Watters,* 328 Md. at 48, 612 A.2d 1288.

Similarly, *Nieves, supra,* 90 N.Y.2d 426, 660 N.Y.S.2d 858, 683 N.E.2d 764, is noteworthy. There, the New York Court of

Appeals recognized the particular importance of access to trial for a criminal defendant's family. It ordered a new trial after it determined that a limited closure, which barred the defendant's family from trial during the testimony of an undercover police officer, was broader than necessary to protect the interests of the state. Of particular significance here, Chief Judge Kaye, writing for a unanimous court, observed:

> Where ... the trial court is aware that the defendant's relatives have been attending the proceedings or that the defendant would like to have certain family members present, exclusion of those individuals must be necessary to protect the interest advanced by the People in support of closure.

*Id.,* 660 N.Y.S.2d 858, 683 N.E.2d at 766 (citations omitted).

In this case, as in *Nieves,* the judge clearly was aware, from her own observations, that appellant's family had attended the proceedings until the issuance of the closure order. Moreover, based on defense counsel's repeated requests, the court certainly realized that appellant wanted his family to attend his trial.

The case of *Vidal v. Williams,* 31 F.3d 67 (2d Cir.1994), *cert. denied,* 513 U.S. 1102, 115 S.Ct. 778, 130 L.Ed.2d 672 (1995), is also instructive with respect to a family's right to attend a criminal trial. In its review of a habeas corpus action, the Second Circuit ruled that the trial court erred in barring the defendant's parents from the trial during the testimony of an undercover police officer. In reaching that conclusion, the court recognized the "special concern for assuring the attendance of family members of the accused." *Id.* at 69 (citation omitted). Moreover, in *In re Oliver,* 333 U.S. at 272, 68 S.Ct. 499, the Supreme Court observed in dicta "that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."

In assessing a partial closure order, many federal courts have applied the "substantial reasons" standard. *See, e.g., United States v. Osborne,* 68 F.3d 94, 98–99 (5 th Cir.1995);

*United States, v. Farmer,* 32 F.3d 369, 371 (8 th Cir.1994); *Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir.1992); *United States v. Sherlock,* 962 F.2d 1349, 1356–57 (9 th Cir.1989), *cert. denied,* 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992); *Nieto v. Sullivan,* 879 F.2d 743, 753 (10 th Cir.), *cert. denied,* 493 U.S. 957, 110 S.Ct. 373, 107 L.Ed.2d 359 (1989); *Douglas v. Wainwright,* 739 F.2d 531, 533 (11 th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). These courts have generally reasoned that, in considering the legality of a partial closure, a "less stringent standard [is] justified because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does." *Woods,* 977 F.2d at 76 (citations omitted); *see also People v. Chan,* 230 A.D.2d 165, 656 N.Y.S.2d 22, 27–28 (1997), *aff'd,* 91 N.Y.2d 913, 669 N.Y.S.2d 527, 692 N.E.2d 558 (N.Y.1998) (upholding limited closure of courtroom because of concerns about witness). Even under a less stringent standard, however, we cannot uphold the trial court's broad order.

As the transcript reflects, the trial judge here repeatedly indicated that she evicted the family members because of their unruly conduct following Watkins's attack on appellant. She said, in part: "I put them out because they couldn't control themselves. I have no guarantee that if [Watkins] comes to testify that they wont try something, and I am not—no, I am not going to let them in." In considering the closure order, we must consider the factors identified earlier in light of what occurred.

As we noted, the State never requested the closure to advance its particular interests. Instead, the judge acted *sua sponte* in barring appellant's family. To be sure, the family did not act with composure, but the behavior was hardly beyond normalcy, given the circumstances. Indeed, there was no script for what occurred; the family simply responded like human beings, not automatons, when their loved one was attacked. Although the family was not responsible for the underlying assault, the judge seemed to fault them for the way in which they reflexively and instinctively responded to a frightening situation that was unforeseen and not of their

doing. To the extent the family behaved inappropriately, the videotape indisputably established that the entire incident lasted less than a minute, so that the family's improper conduct was hardly prolonged. In addition, the court treated all three family members as if they were one and the same with regard to the outburst. The court articulated several specific findings criticizing the family collectively, including, *inter alia*: "[T]hey left their seats. *They* approached this rail. *They* were all yelling. I told *them* to leave ... *they* made eye contact with me and refused to do that...." (Emphasis added). The court further found that all three women "were going to get into [the fight]." We also observe that there was no indication that the family had been disorderly in the courtroom prior to the incident.

We acknowledge that the incident was disturbing, if not frightening, and the trial judge, to her credit, was remarkably composed. Nonetheless, the breadth of the closure order exceeded what was needed to maintain order and dignity. Indeed, the court's closure order was far broader than the closures at issue in *Watters* and *Walker*, which required reversals in each case. *Watters* was reversed, even though it concerned a total closure only during *voir dire*. *See Watters*, 328 Md. at 48, 612 A.2d 1288 (observing that the Supreme Court "has not retreated from the view that the deprivation of the constitutional right to a public trial cannot be harmless error"). *Walker* required a reversal, even though the members of the defendant's family were excluded only during the testimony of two witnesses. In contrast, this case involved a closure for the entire trial as to three people who surely were among the ones most interested in attending.

In our view, the closure order was tantamount to a punishment that contravened the Sixth Amendment. Our view is founded on the following considerations: the incident was precipitated by a third party (i.e., not appellant or his family); the family's conduct was induced by an unexpected and frightening assault on the son/brother/boyfriend; the family's breach of courtroom etiquette spanned about 30 seconds; there was not a shred of evidence that the family had previ-

ously been unruly in the courtroom; the defendant indisputably wanted his family to attend the trial; and the State did not identify even a single interest that it sought to protect by closure.

Further, notwithstanding the defense attorney's persistent and well-stated requests to allow the family to attend the trial, there is no indication that the court gave any thought to less restrictive options. Several less restrictive options, narrowly tailored to meet the exigencies perceived, were available to meet the court's concerns for security and order. For example, because Watkins was immediately handcuffed and jailed, any concern for security involving him had been largely abated. Thus, the court could have permitted the family to remain in the courtroom, except when Watkins was called to testify. *See, e.g., Woods v. Kuhlmann,* 977 F.2d 74, 76 (2 d Cir.1992) (upholding trial court's order to exclude defendant's family while the witnesses testified because members of the defendant's family had allegedly threatened the witness); *United States v. Sherlock,* 962 F.2d 1349, 1357–58 (9 th Cir.1989), *cert. denied,* 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992)(upholding temporary exclusion of the defendant's family members during the rape victim's testimony, because the judge observed said persons making faces and mocking the witness). Alternatively, on the basis of the conduct of the one woman who actually came closest to the rail, there was no reason to exclude all three women for the entire trial. Instead, the court could have limited the closure order to the woman who had approached the rail. *See e.g. United States v. Osborne,* 68 F.3d 94, 99 (5 th Cir.1995)(upholding the trial court's order excluding only the accused's sister while the twelve year old victim testified, to protect the minor from emotional harm). The court also could have chosen to reprimand the women and to warn them that, regardless of what happens in the courtroom, no further outbursts would be tolerated. The court might also have considered allowing the women to rotate in the courtroom, one at a time. It also could have required the family to sit apart from each other, on different benches.

**76**

We conclude that, in barring the family from the trial, the court abused its discretion. Because the court's closure order violated appellant's constitutional right to a public trial, we shall vacate appellant's convictions and remand for further proceedings.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDING. PRINCE GEORGE'S COUNTY TO PAY THE COSTS.**